1

2

3

4                                              **E-FILED on** _____11/2/05_____

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   TELE ATLAS N.V. and TELE ATLAS NORTH          No. C-05-01673 RMW
     AMERICA,
13                                                 ORDER GRANTING IN PART AND
                    Plaintiffs,                    DENYING IN PART DEFENDANT'S
14                                                 MOTION TO DISMISS
              v.
15                                                 **[Re Docket No. 24]**
     NAVTEQ CORPORATION,
16
                    Defendant.
17

18        Plaintiffs Tele Atlas N.V. and Tele Atlas North America ("Tele Atlas") have sued defendant

19   NAVTEQ Corporation ("NAVTEQ") for (1) violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2,

20   (2) violation of the Clayton Act, 15 U.S.C. § 14, (3) violation of California Business and Professions Code

21   §§ 16720, 16726, 16727, and 17200, (4) intentional interference with contractual relations, and (5)

22   intentional interference with prospective economic advantage.  NAVTEQ moves to dismiss Tele Atlas' first

23   amended complaint ("FAC").  The court has read the moving and responding papers and considered the

24   arguments of counsel.  For the reasons set forth below, the court grants in part and denies in part

25   NAVTEQ's motion.

26

27

28

# I. BACKGROUND

Tele Atlas and NAVTEQ license digital map data to makers of navigation devices.  FAC ¶ 1. According to Tele Atlas, Etak, Inc. ("Etak") introduced the first consumer navigation system in 1985.  *Id*. at ¶ 29.  Etak and NAVTEQ were competitors for about ten years.  *Id*. at ¶ 30.  In 1996, Sony Corporation of America ("Sony") bought Etak.  *Id*. at ¶ 31.  Tele Atlas contends that Sony limited its investment in Etak, causing Etak to lose its ability to license digital map data effectively and allowing NAVTEQ to dominate the market.  *Id*. at ¶ 31.  Tele Atlas acquired Etak in 2000.  *Id*. at ¶ 32.  Between 2000 and 2002 Tele Atlas "upgrade[d] Etak's outmoded digital map data so that it would once again be competitive."  *Id*. at ¶ 33. This effort involved dispatching field collectors to drive "over roads covering more than 55% of the populated regions in the United States" and "image-attribut[ing]" 80% of these areas.  *Id*.

In January 2003 Tele Atlas allegedly introduced the MultiNet North America: "a map database of North America that supported routing applications to provide precise, efficient, legal and physically reliable turn-by-turn directions[,] . . . featured links to real-time traffic coverage[,] and included a wide range of 'point of interest' such as gas stations, hotels and airports."  *Id*. at ¶ 34.  By early 2004 Tele Atlas' field collectors had covered 80% of the United States and Tele Atlas' digital map data "was at least commensurate with—and in some respects superior to—the quality of NAVTEQ's digital map data."  *Id*. at ¶ 35.

However, Tele Atlas alleges, NAVTEQ's anti-competitive conduct has prevented Tele Atlas from entering the market.  *Id*. at ¶ 22.  Tele Atlas defines the relevant geographic market as the United States. *Id*. at ¶ 11.  According to Tele Atlas, the relevant technological market is the "Perspective Navigation Display Technology Market," which involves "methods for displaying portions of a topographic map on a personal navigation device from an apparent perspective [of] outside and above a vehicle."  *Id*. at ¶ 12. Tele Atlas alleges that NAVTEQ enjoys monopoly power in this market.  *Id*. at ¶ 13.  Tele Atlas contends that there are three relevant product markets: (1) the "Embedded Device Market," which "consists of licenses to digital map data for use in navigation devices that are intended for permanent installation in automobiles," (2) the "PNV Device Market," which "consists of licenses to digital map data for use in personal navigation devices, including handheld devices as well as devices that may be affixed onto or near a car's dashboard," and (3) the "Navigation Device Market," which "consists of licenses to digital map data

1    for use in navigation devices." *Id*. at ¶¶ 14-17.  Tele Atlas asserts that NAVTEQ's market share is about

2    (1) 95% of the Embedded Device Market, (2) 70 to 75% of the PNV Device Market, and (3) 75% of the

3    Navigation Device Market.  *Id*. at ¶¶ 15-17.

4       Tele Atlas claims that NAVTEQ's "first mover" advantage in the Embedded Device Market

5    "shield[s its] monopoly power and market power" because automakers "are generally hesitant to switch to

6    new products." *Id*. at ¶ 26.  In addition, Tele Atlas contends, NAVTEQ has entered into contracts with

7    automakers "that effectively require embedded device makers to license NAVTEQ data." *Id*. at ¶ 36.

8    Moreover, Tele Atlas asserts, NAVTEQ locked up the Automobile Association of America ("AAA") "by

9    literally giving data away for free to AAA for up to two years. *Id*. at ¶¶ 3, 37.

10      Tele Atlas also alleges that NAVTEQ has "adopted the same methods used to exclude Tele Atlas

11    from the Embedded Device Market to exclude Tele Atlas from the PNV Device Market." *Id*. at ¶ 40.

12    Tele Atlas contends that NAVTEQ often requires licensees to pre-pay in amounts that cover five years or

13    more of service. *Id*. at ¶ 41.  In addition, according to Tele Atlas, "NAVTEQ provides free sophisticated

14    and eye-catching PNV device displays" for retailers who commit exclusively to showcasing PNV devices

15    that incorporate NAVTEQ's data. *Id*. at ¶ 42.  Tele Atlas also asserts that NAVTEQ illegally ties

16    Perspective Navigation Display Technology to the licensing of NAVTEQ's data for use in PNV devices.

17    *Id*. at ¶ 44.  According to Tele Atlas, NAVTEQ threatened to sue Navman and TomTom—two PNV

18    device makers that license digital map data from Tele Atlas—for infringing U.S. Phillips Corporation's U.S.

19    Patent No. 5,151,886 ("the "'886 Patent").  *Id*. at ¶ 45.  Tele Atlas alleges that NAVTEQ, which licenses

20    the '886 patent, told Navman and TomTom that it would not sue them if they licensed the '886 patent.  *Id*.

21    at ¶¶ 46-47.  Tele Atlas contends that Navman acquiesced to NAVTEQ's demands.  *Id*. at ¶ 49.  Tele

22    Atlas claims that TomTom agreed to license the '886 patent from NAVTEQ only after NAVTEQ filed a

23    patent infringement suit against TomTom.  *Id*. at ¶ 50.[1]

24                 **II.  ANALYSIS**

25      Dismissal under Rule 12(b)(6) is proper only when a complaint exhibits either a "lack of a

26    cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri*

27

28        [1]     Tele Atlas asserts that NAVTEQ's conduct also permitted it to monopolize the Navigation Device Market.  FAC ¶ 53.

1  *v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept the facts alleged in

2  the complaint as true.  *Id*.  "A complaint should not be dismissed 'unless it appears beyond doubt that the

3  plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Gilligan v.*

4  *Jamco Dev.Corp.*, 108 F.3d 246, 248 (9th Cir. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46

5  (1957)).

6          Federal Rule of Civil Procedure 8(a) requires complaints to contain "a short and plain statement of

7  the claim showing that the pleader is entitled to relief."  "[A]ntitrust pleadings need not contain great factual

8  specificity" than other complaints.  *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662

9  F.2d 641, 648 (9th Cir. 1981).  "However, the court is not required to accept legal conclusions cast in the

10  form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."  *Clegg*

11  *v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).  "Nor is the court required to accept

12  as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

13  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

14

15          **A.      Tele Atlas' Exclusive Dealing Claims**

16          Tele Atlas' first four causes of action allege that NAVTEQ violated (1) section 1 of the Sherman

17  Act,[2] (2) section 2 of the Sherman Act,[3] (3) section 3 of the Clayton Act,[4] and (4) California Business and

18  _____

19      [2]      Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust
or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.

20  To state a claim under section 1, a plaintiff must allege "(1) an agreement, conspiracy, or combination
between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason

21  analysis; and (3) the restraint affected interstate commerce."  *American Ad Mgt., Inc. v. GTE Corp.*, 92
F.3d 781, 788 (9th Cir. 1996).  However, "any particular exclusive-dealing arrangement does not violate

22  section 1 unless it is found to be unreasonable."  *Twin City Sportservice, Inc. v. Charles O. Finley &*
*Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir. 1982).

23

24      [3]      Section 2 of the Sherman Act forbids the "monopoliz[ation], or attempt[ed] . . .
monopoliz[ation], [of] . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.

25  "In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1)
[p]ossession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that

26  power; and (3) causal antitrust injury."  *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817
(9th Cir. 1992) (alteration added).  "The following elements are required to establish an attempt to

27  monopolize claim: '(1) specific intent to control prices or destroy competition; (2) predatory or
anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4)

28  causal antitrust injury.'"  *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d
780, 783 (9th Cir. 1996) (quoting *Pacific Express*, 959 F.2d at 817). "Although not illegal in themselves,

1    Professions Code sections 16720 and 16726.[5]  Compl. ¶¶ 54-77.  NAVTEQ moves to dismiss these

2    claims to the extent they allege that NAVTEQ engaged in exclusive dealing.  According to NAVTEQ, Tele

3    Atlas has failed to "allege a factual predicate" for these causes of action, "including the specific customers,

4    agreements, or products supposedly involved."  Mot. Dism. at 8:23-26.

5           Courts occasionally seem to reach divergent results on whether antitrust claims contain enough

6    detail to survive a motion to dismiss.  Some courts do not require the plaintiff to name the parties who

7    allegedly entered into an illegal contract with the defendant.  For example, in *Virgin Atlantic Airways Ltd.*

8    *v. British Airways PLC*, 872 F.Supp. 52 (S.D. N.Y. 1994), Virgin Atlantic Airways ("Virgin") sued

9    British Airways for exclusive dealing.  Virgin alleged that British Airways rewarded travel agents for selling

10   specified numbers of British Airways tickets and gave corporate customers rebates "on the condition that

11   they purchase all or a certain high percentage of their travel requirements from British Airways."  *Id*. at 56-

12   58.  British Airways moved to dismiss, arguing that "the complaint does not identify the specific

13   corporations and travel agents with whom [British Airways] is alleged to have executed illegal agreements."

14   *Id*. at 65-66.  The court denied the motion, reasoning that "such specificity is not required when the sources

15   of proof are clearly within the defendant's control."  *Id*. at 66.

16          Likewise, in *Hewlett-Packard Co. v. Arch Associates Corp.*, 908 F.Supp. 265 (E.D. Pa. 1995),

17   the court did not require an antitrust plaintiff to name the entities that benefitted from the defendant's

18   _____

19   exclusive dealing arrangements can be an improper means of maintaining a monopoly."  *U.S. v. Dentsply
     Intern., Inc.*, 399 F.3d 181, 187 (3d Cir. 2005).

20
          [4]     Section 3 of the Clayton Act prohibits improper "tying arrangements": the "lease or     . . .
21   sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether
     patented or unpatented, for use, consumption, or resale within the United States . . . on the condition,
22   agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares,
     merchandise, machinery, supplies, or other commodities of a competitor . . . ."  15 U.S.C. § 14.  "In
23   practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not
     violate the section unless the court believes it probable that performance of the contract will foreclose
24   competition in a substantial share of the line of commerce affected."  *Tampa Elec. Co. v. Nashville Coal
     Co.*, 365 U.S. 320, 327 (1961).
25
          [5]     California Business and Professions Code sections 16720 and 16726 outlaw, *inter alia*,
26   conduct that "prevent[s] competition in manufacturing, making, transportation, sale or purchase of
     merchandise, produce or any commodity."  "[S]ections 16720 and 16726 . . . were patterned after the
27   Sherman Act" and thus the requirements for stating a claim under both federal and California antitrust
     statutes are similar.  *See Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d
28   532, 540-43 (1980).

     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW
     DOH

1  allegedly anticompetitive conduct.  In that case, Arch Associates ("Arch"), a printer dealership, sued

2  Hewlett-Packard ("HP"), an electronics manufacturer.  Arch alleged that HP assisted a certain type of

3  dealership by giving them cash rebates without requiring them to document sales.  *Id*. at 269.  However,

4  Arch's complaint stated only that "HP, in concert with certain members of its authorized distribution

5  network, . . . unlawfully conspired and combined in an effort to expand its monopoly and to further restrain

6  trade."  *Id*. (ellipsis in original).  HP moved to dismiss on the grounds that Arch's allegations involved

7  "unnamed conspirators" and were "conclusory."  *Id*. at 268.  The court denied the motion, reasoning that

8  the conspirators were "a finite group whose members can be determined through discovery" and that "the

9  subject matter of the alleged contracts is sufficiently identified by the pleading."  *Id*. at 269.

10  Conversely, in *JM Computer Servs., Inc. v. Schlumberger Tech., Inc.*, 1996 WL 241607 (N.D.

11  Cal. 1996), a semiconductor testing company sued a competitor for exclusive dealing. The complaint

12  accused the defendant of forming illegal contracts with an ascertainable class of companies:

> [Defendant] entered into exclusive dealing agreements with the manufacturers of the parts . . . in the relevant parts markets that Defendant itself did not manufacture.  The purpose of the exclusive agreements was to harm competition in general in the relevant markets.  These agreements actually did harm competition in the relevant markets.  These exclusive dealing agreements unreasonably deprived [Plaintiff] of a needed source of supply and froze out of the market a significant fraction of the buyers and sellers.

*JM Computer*, 1996 WL 241607 at *4 (ellipsis and second alteration in original).  Nevertheless, the court

dismissed the claim, reasoning that the plaintiff "failed to identify an agreement with a specific person or

entity and does not identify the parts, services, or contracts involved in the alleged exclusive dealing."  *Id*.

The court concludes that Tele Atlas' exclusive dealing claims are sufficiently detailed to survive

NAVTEQ's motion.  Admittedly, Tele Atlas fails to name the entities with which NAVTEQ supposedly

struck exclusive deals.  Nevertheless, unlike *JM Computer*, where the plaintiff's skeletal complaint recited

only that the defendant had "entered into exclusive dealing arraignments" with "manufacturers of parts," Tele

Atlas explains how NAVTEQ's alleged scheme operates.  Tele Atlas asserts that NAVTEQ has "enter[ed]

into contracts with automakers that effectively require embedded device makers to license NAVTEQ data.

Once an automaker agrees to support NAVTEQ, each supplier of embedded devices to that automaker

must either license NAVTEQ data or lose the automaker's business."  FAC ¶ 36.  Other than the reference

to "parts manufacturers," the allegations in *JM Computer* declared without explanation that the defendant

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW DOH

6

1  had broken the law.  The allegations here, however, are not mere legal conclusions.  Although the line

2  between a fact and a legal conclusion can be razor-thin[6], Tele Atlas' assertions do not revolve entirely

3  around legal concepts and are better characterized as factual.  Because NAVTEQ likely knows the identity

4  of this "finite group" of "automakers," it is on notice of Tele Atlas' claim.

5          NAVTEQ's other authority is inapposite.  NAVTEQ cites *Aquatherm Industries, Inc. v. Florida*

6  *Power & Light Co.,* 145 F.3d 1258 (11th Cir. 1998) and *Nine West Shoes Antitrust Litig.*, 80 F. Supp.

7  2d 181 (S.D. N.Y. 2000) for the proposition that "[i]n the similar context of antitrust conspiracies, courts

8  routinely dismiss complaints that fail to identify the alleged co-conspirators."  Mot. Dism. at 9:14-21.

9  However, *Aquatherm* actually held that the plaintiff's conspiracy to monopolize claim failed because the

10  plaintiff failed to name co-conspirators and thus could not establish intent to monopolize, a necessary

11  element of the claim.  *See Aquatherm*, 145 F.3d at 1261.  In addition, the plaintiff's allegations were much

12  like those of the plaintiff in *JM*.  *See id.* (plaintiff alleged that defendant "combined and conspired in a

13  concerted action with manufacturers and sellers of electric pool heat pumps and pool contracting firms in its

14  geographic area").  As discussed above, unlike *Aquatherm*, Tele Atlas has provided *some* modicum of

15  detail.  On the other hand, *Nine West Shoes* actually denied a motion to dismiss a conspiracy claim

16  because—as here—"[t]he complaint gives some detail about how this conspiracy operated."  *Nine West*

17  *Shoes*, 80 F. Supp. 2d at 191.  Thus, the court denies NAVTEQ's motion with respect to Tele Atlas'

18  exclusive dealing causes of action.

19          **B.    Tele Atlas' Tying Claims**

20          NAVTEQ also moves to dismiss Tele Atlas' first five causes of action to the extent they allege that

21  NAVTEQ entered into illegal tying arrangements.[7]  To state a claim for *per se* tying under sections 1 and 2

22  of the Sherman Act, a plaintiff must allege that the defendant (1) tied two products or services sold in the

23  relevant markets, (2) had sufficient economic power in the tying market to affect the tied market, and (3)

24  _____

25          [6]     That someone did something illegal is, after all, a "fact."

26          [7]     Tele Atlas' fifth cause of action is for violation of California Business and Professions Code
section 16727.  That provision, which is similar to section 3 of the Clayton Act, forbids parties from making
contracts "for the sale of goods, merchandise, machinery, supplies, commodities . . . on the condition,
27  agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods,
merchandise, machinery, supplies, commodities, or services of a competitor."  Cal. Bus. & Prof. Code §
28  16727.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW
DOH

affected a substantial volume of commerce in the tied market. *See California Glazed Prods., Inc. v. Burns & Russell Co.*, 708 F.2d 1423, 1427 (9th Cir. 1983). To state a "rule of reason" tying claim, a plaintiff must allege that the defendant (1) entered into a tying arrangement (2) that adversely affected competition. *See Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 31 (1984) (plurality opinion). Similar rules apply under the Clayton Act, *see Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n.2 (9th Cir. 1984), and under California's antitrust statutes, *see Suburban Mobile Homes*, 101 Cal. App. 3d at 542-43.

NAVTEQ cites *CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003), *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544 (S.D. Tex. 1991), and *StunFence v. Gallagher Sec.*, 2002 WL 1837128 (N.D. Ill. 2002) to support its contention that Tele Atlas' failure to "allege that the tying arrangement at issue affects a substantial amount of commerce in the tied product market" dooms its claims. Mot. Dism. at 13:12-16.

In NAVTEQ's cited cases, courts dismissed tying claims that were either woefully deficient in crucial areas or could not logically give rise to a viable cause of action. For example, *CCBN.com*, dismissed a tying claim that failed to (1) allege the existence of contracts that could have given rise to a tying agreement, (2) identify any customers who had entered into such contracts, and (3) estimate the defendant's market share. *See CCBN.com*, 270 F. Supp. 2d at 154-55. Similarly, in *Rockbit*, the plaintiff alleged that the defendant had "sufficient power in the market for horizontal drilling technology to force the use of its bits on customers because . . . [the market] is a research intensive, patent dominated, developing field, and [the defendant] is allegedly one of the few companies which has patents in this technology." *Rockbit*, 802 F. Supp. at 1549. Yet the plaintiff did not "identif[y] the patents held by [the defendant], nor . . . allege[ ] the percentage of the horizontal drilling technology market possessed by [the defendant] which purportedly gives [it] sufficient power to exert coercive pressure on its customers." *Id*. at 1540. Finally, in *StunFence*, the plaintiff's own allegations—that the defendant tied commonly-used products—foreclosed the possibility of proving that the alleged tying "affect[ed] a substantial volume of commerce." *StunFence*, 2002 WL 1838128 at *2.

Tele Atlas' tying claims are more specific. Tele Atlas asserts that NAVTEQ used the specter of an infringement suit to bully Navman and Tom Tom into purchasing a license under the '886 patent. FAC ¶¶

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW DOH

1   44-50.  Thus, unlike the plaintiffs claims in *CCBN.com*, Tele Atlas' claims spring from specific customers

2   and a specific contract.  In addition, unlike the plaintiff in *Rockbit*, Tele Atlas accuses NAVTEQ of

3   misusing a specific patent.  Moreover, Tele Atlas estimates that NAVTEQ's market share is about (1) 95%

4   of the Embedded Device Market, (2) 70 to 75% of the PNV Device Market, and (3) 75% of the

5   Navigation Device Market.  *Id*. at ¶¶ 15-17.  These allegations give rise to a reasonable inference that

6   NAVTEQ's alleged wrongdoing affects a substantial amount of commerce.  As such, they suffice to state a

7   tying claim.  *See Slattery v. Apple Computer, Inc.*, 2005 WL 2204981 *3 (N.D. Cal. 2005) (denying

8   motion to dismiss tying claim where plaintiff's allegation "that [d]efendant posses an 80 percent market

9   share" in one relevant market and "over a 90 percent market share" in another revealed that "the tying

10  would have an effect on a substantial volume of commerce").

11          **C.      Tele Atlas' Third and Fifth Causes of Action**

12          However, the court must dismiss Tele Atlas' tying allegations in its third and fifth causes of action for

13  another reason.  Section 3 of the Clayton Act and California Business and Professions Code section 16727

14  only forbid tying arrangements with respect to tangible goods.  *See* 15 U.S.C. § 14 ("forbidding parties

15  from making tied contracts for the sale of "goods, wares, merchandise, machinery, supplies, or other

16  commodities"); Cal. Bus. & Prof. Code § 16727 (applying to "goods, merchandise, machinery, supplies,

17  commodities").  Here, Tele Atlas asserts that NAVTEQ improperly "conditioned the purchase of [a] patent

18  license on the additional licensing of NAVTEQ's digital map data."  FAC ¶ 48.  A license is not the sale of

19  a tangible good.  *See La Salle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F. Supp. 1004,

20  1006 (N.D. Ill. 1968) (holding that a patent license is "the sale of the right or privilege of using a particular

21  method or process" and thus does not fall within the word "commodity" under the Clayton Act).

22          Tele Atlas contends that "the licenses at issue here concern the '886 patent, a patent 'purpot[ing] to

23  claim certain methods and *devices* for the perspective display of a portion of topographic information'" and

24  that "NAVTEQ's license to the '886 patent conveys the right to manufacture 'products' . . . ."  Opp. Mot.

25  Dism. at 19:27-20:2 (quoting FAC ¶ 46) (alteration and emphasis added by Tele Atlas).  Tele Atlas cites

26  *Ansel Comms. v. Novell*, 1999 WL 33302368 (N.D. Cal. 1999) for the proposition that courts look to

27  the "dominant nature of the transaction between the parties" to determine "whether [a] contract represents a

28  sale of tangible goods."  Opp. Mot. Dism. at 20:7-14 (quoting *Ansel*, 1999 WL 33302368 at *2)

1  (alteration added).  According to Tele Atlas, the dominant nature test is fact-intensive and not properly

2  resolved on a motion to dismiss.

3        Tele Atlas' arguments lack merit.  "Courts have strictly construed" the term "commodit[y]" and held

4  "that it denotes only tangible products of trade." *Innomed Labs, LLC v. Alza Corp.*, 368 F.3d 148, 155

5  (2d Cir. 2004) (quoting *May Dep't Store v. Graphic Process Co.*, 637 F.2d, 1211, 1214 (9th Cir.

6  1980)).[8]  Indeed, the word "commodity" means a "tangible good, such as products or merchandise."

7  Black's Law Dictionary 291 (8th ed. 2004).  Thus, courts apply the dominant nature test only where "the

8  subject of the contract is a *combination* of goods and intangible rights and services." *Id*. at 156 (emphasis

9  added).  Here, Tele Atlas alleges that NAVTEQ sold a purely ethereal consideration: "the right to

10  manufacture 'products.'"  FAC ¶ 46.  Because Tele Atlas does not allege that NAVTEQ also sold a

11  physical item, there is no reason to apply the dominant nature test.  *See Allen Archery, Inc. v. Browning*

12  *Mfg. Co.*, 1982 WL 1840 *1-*2 (D. Utah 1982) (license granting "the nonexclusive right to manufacture,

13  use and sell compound bows . . . [is] an intangible right that [i]s in no sense a commodity"); *Record Club of*

14  *Am., Inc. v. Capitol Records, Inc.*, 1971 WL 558 *3 (S.D. N.Y. 1971) ("the right to manufacture

15  embodied in [license] agreements is not a 'commodity'").

16        *Ansel* is not to the contrary.[9]  In *Ansel*, the court applied the dominant nature test to software

17  licenses under the Robinson-Patman Act, 15 U.S.C. s 13(c).  *Ansel*, 1999 WL 33302368 at *2.

18  However, the licensor admitted that its product included "tangible materials, such as disks and packaging."

19  *Id*.  Moreover, the licensor's contracts stated that "it is selling 'the tangible personal property described

20  herein.'"  *Id*.  Accordingly, the court held that factual issues remained as to whether the dominant nature of

21  the agreements was tangible or intangible.  *See id*.  Here, on the other hand, Tele Atlas does not allege that

22

23  ─────────────────────

24        [8]    *Innomed* expressed no opinion "on whether contracts involving not only the sale of a
       patented product, but also the right to exploit the patent itself in some way, such as permitting the
25     manufacture of additional products, may be subject to the dominant nature test." *Innomed*, 268 F.3d at
       161 n.4.  Here, however, Tele Atlas does not allege that NAVTEQ's licenses, standing alone, involved "the
26     sale of a patented product."

27        [9]    Neither is *May*, which applied the dominant nature test to a contract that involved both an
       "intangible ingredient, artwork," and "a tangible product," which was the artwork recast in a newspaper-
28     ready form called a "velox." *May*, 637 F.2d at 1216.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW
DOH

1    NAVTEQ's licenses include anything corporeal.  Thus, because a patent license is not a tangible good, the

2    court must dismiss Tele Atlas' third and fifth causes of action to the extent they allege tying violations.

3           **D.     Tele Atlas' Unfair Competition and Intentional Interference with Contractual**
                     **Relations Claims**

4

5           Tele Atlas' sixth and seventh causes of action seek redress for violation of California Business and

6    Professions Code section 17200 and intentional interference with contractual relations.  FAC ¶¶ 83-94.  A

7    plaintiff must predicate these causes of action on some other form of illegal conduct.  *See Barquis v.*

8    *Merchants Collection Ass'n*, 7 Cal. 3d 94, 113 (1972) (section 17200 forbids "anything that can properly

9    be called a business practice and that at the same time is forbidden by law"); *PG&E v. Bear Sterns &*

10   *Co.*, 50 Cal. 3d 1118, 1126 (1990) (intentional interference with contractual relations involves, *inter alia*,

11   "intentional acts designed to induce breach or disruption of [a] contractual relationship").  NAVTEQ moves

12   to dismiss these claims on the grounds that Tele Atlas has failed to state a claim for antitrust violations.[10]  As

13   discussed above, the court finds that Tele Atlas has, in fact, stated claims for antitrust violations.  Thus, the

14   court denies NAVTEQ's motion with respect to these claims.

15          **E.     Tele Atlas' Intentional Interference with Prospective Economic Advantage Claim**

16          Tele Atlas' eighth cause of action claims that "NAVTEQ intended to harm Tele Atlas by interfering

17   with Tele Atlas' prospective contractual relationships . . . with third parties."  FAC ¶¶ 97.  The elements of

18   a claim for interference with prospective economic advantage include, *inter alia*, "an economic relationship

19   between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff."

20   *Pacific Gas & Elec. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 n.2 (1990).  Courts often require a

21   plaintiff to identify at least one such "third party" to state a claim.  *See, e.g., Morton v. Rank America,*

22   *Inc.*, 812 F.Supp. 1062, 1075 (C.D. Cal. 1993) (dismissing intentional interference with prospective

23   advantage claim where plaintiffs failed to identify any third party with whom it had a "legal relationship");

24   _____

25          [10]    In its reply brief, NAVTEQ also contends that Tele Atlas "has failed to state a claim for
     intentional interference with contractual relations because [it] does not allege any breach or disruption of
26   Tele Atlas' relations with its customers."  Rep. Mot. Dism. at 14:19-21.  However, Tele Atlas does allege
     that NAVTEQ forced Navman and Tom Tom to license digital map data, thus disrupting Tele Atlas'
27   contractual relationships with these companies.  FAC ¶¶ 45, 88-92.  Under the liberal standards of Rule 8,
     Tele Atlas' pleadings are sufficient.  NAVTEQ then argues that Tele Atlas continues to have a vibrant
28   business relationship with Navman and Tom Tom.  This argument is not persuasive at the motion to dismiss
     stage.

*Pinnacle Systems, Inc. v. XOS Technologies, Inc.*, 2003 WL 21397845 *6 (N.D. Cal. 2003) ("[i]n order to state a claim, [plaintiff] must allege that it had a relationship with and expected to receive an economic benefit from a specific third party").  Because Tele Atlas fails to identify the "third parties" with which it had "economic relationships," the court dismisses this claim.

**III.  ORDER**

For the foregoing reasons, the court:

1.    Grants NAVTEQ's motion to dismiss Tele Atlas' third and fifth causes of action to the extent they allege tying violations;

2.    Grants NAVTEQ's motion to dismiss Tele Atlas' intentional interference with prospective economic advantage claim;

3.    Gives Tele Atlas twenty days leave to amend; and

4.    Denies NAVTEQ's motion in all other respects.

DATED:      11/2/05                          /s/ Ronald M. Whyte

RONALD M. WHYTE
United States District Judge

1  **Notice of this document has been electronically sent to:**

2  **Counsel for Plaintiff:**
   John Quinn                johnquinn@quinnemanuel.com
3  David Eiseman             davideiseman@quinnemanuel.com
   Dominic Surprenant        dominicsurprenant@quinnemanuel.com
4  William Morehead          williammorehead@quinnemanuel.com

5  **Counsel for Defendant:**
   Andrew Bridges            abridges@winston.com
6  Dan Webb                  dwebb@winston.com
   George Lombardi           glombardi@winston.com
7  David Koropp              dkoropp@winston.com

8  Counsel are responsible for distributing copies of this document to co-counsel that have not registered for
   e-filing under the court's CM/ECF program.
9

10 **Dated:**      _____DOH_____        _____11/02/05_____

11                                                  **Chambers of Judge Whyte**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS —C-05-01673 RMW
DOH