1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

E-filed:  **10/28/2008**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TELE ATLAS N.V. and TELE ATLAS NORTH AMERICA, <br><br> Plaintiffs, <br><br> v. <br><br> NAVTEQ CORPORATION, <br><br> Defendant. | No. C-05-01673 RMW <br><br> **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT <br><br> **[Re Docket Nos. 73, 77, 92, 106, 185]** |

Defendant NAVTEQ Corp. ("NAVTEQ") has filed two motions seeking summary judgment. Plaintiffs Tele Atlas N.V. and Tele Atlas North America (collectively, "Tele Atlas") oppose the motions. One motion requests summary judgment on Tele Atlas' claims predicated on NAVTEQ's alleged tying of patent and data licenses, while the other requests summary judgment on Tele Atlas' claims arising from NAVTEQ's allegedly exclusive dealing contracts. Accompanying the motions for summary judgment are various cross-motions on evidentiary matters. The court has read the moving and responding papers associated with the motions and considered the arguments of counsel. For the reasons set forth below, the court denies Tele Atlas leave to submit an additional expert report. The court grants in part and denies in part the motions to strike evidentiary material as

United States District Court

For the Northern District of California

described below.  The court grants NAVTEQ's motions for summary judgment with respect to Tele Atlas's tying claims and with respect to Tele Atlas's intentional interference tort claims.  The court denies NAVTEQ's motions for summary judgment in all other respects, preserving Tele Atlas's claims based on exclusive dealing and monopolization, as well as the analogous state law claims.

## I.  EVIDENTIARY MATTERS

The motions for summary judgment are accompanied by multiple evidentiary motions aiming to weaken the opposing parties' position on the merits of the summary judgment motion. Many of the objections are well-taken, as discussed below and throughout this order.

### A.      Dr. Neels' Additional Expert Report

#### 1.      Background on Expert Disclosures

Tele Atlas seeks leave to submit an additional report from its economic expert, Dr. Kevin Neels.  The case management order has been amended piecemeal to adjust deadlines over the past two years (*see* docket nos. 35, 38, 40, 57, 62).  With respect to expert disclosures, the initial (and still governing on this point) case management order imposed a deadline by which the party with the burden of proof on an issue had to disclose any expert report bearing on the issue.  *See* Docket No. 35 ¶ 2.  The party without the burden of proof on an issue then had to disclose any rebuttal expert report by a certain time.  *See id.* ¶ 4.  The case management order contains no provision allowing any further expert disclosures.

In accord with these terms, Tele Atlas served NAVTEQ with the expert report of Dr. Neels on July 25, 2007.  *Baily I* ¶ 2.[1]  In turn, NAVTEQ served the rebuttal expert report of Dr. William Kerr on August 30, 2007.  *Id.* ¶ 3.  Dr. Neels was deposed on September 25, 2007, and Dr. Kerr was deposed on October 4, 2007.  *Id.* ¶ 5.

---

[1]      Melissa J. Baily has filed at least four declarations related to the motions that are the subject of this order.  The court refers to them as follows: Decl. of Melissa J. Baily In Support of Plaintiffs' Motion for Leave to Submit Additional Expert Disclosure ("*Baily I*"); Second Decl. of Melissa J. Baily In Support of Plaintiffs' Motion for Leave to Submit Additional Expert Disclosure ("*Baily II*"); Decl. of Melissa J. Baily In Support of Plaintiffs' Opposition to NAVTEQ's Motion to Strike Declarations in Support of Plaintiff's Opposition to NAVTEQ's Motions for Partial Summary Judgment ("*Baily III*"); and Decl. of Melissa J. Baily in Support of Plaintiffs' Opposition to NAVTEQ's Motions for Partial Summary Judgment ("*Baily IV*").

United States District Court
For the Northern District of California

1    At some point after receiving Dr. Kerr's report, "counsel for Tele Atlas initiated discussions

2    with counsel for NAVTEQ" about submitting an additional report from Dr. Neels. *Id.* ¶ 6. Tele

3    Atlas does not indicate when it sought NAVTEQ's consent to file an additional expert report.

4    NAVTEQ filed its motions for summary judgment, based in part on the alleged failure of Dr. Neels'

5    testimony to create an issue of fact with respect to certain issues, on September 14 and October 5

6    respectively.  On October 15, 2007, NAVTEQ's counsel refused to allow Tele Atlas to submit an

7    additional expert report from Dr. Neels and Tele Atlas filed the instant motion. *Id.*

8    NAVTEQ's counsel confirms that Tele Atlas made some inquiry about filing a rebuttal

9    expert report by stating that NAVTEQ informed Tele Atlas it could raise the scope of any rebuttal

10   opinion of Dr. Neels at his deposition. *Gervase I* ¶ 6.[2]  At the deposition, Dr. Neels testified as

11   follows:

12   Q:    This is a copy of the rebuttal report of William Kerr.  You've reviewed this
           report, correct?
13   A:    I have.
     Q:    Have you been asked to do anything with it?
14   A:    No, I haven't.
     Q:    Have you reached any conclusions about it?
15   A:    Some.
     Q:    What conclusions have you reached?
16   A:    ████████████████████████████████
     Q:    Anything else?
17   A:    ██████████████████████████████████████
     Q:    Right.
18   A:    ████████████████████████████████████

19   Q:    Anything else?
     A:    That's all that comes to mind as I sit here.
20
     *Id.*, Ex. C at 261:11-262:6.  Based on Dr. Neels' testimony, it appears that he did not begin work on
21
     an additional expert report until at least September 26, 2007.
22
23   Dr. Neels' rebuttal report to Dr. Kerr's rebuttal report was not submitted with the motion for

24      [2]    Megan E. Gervase has also filed a number of declarations related to the motions that are
25   the subject of this order.  The court refers to them as follows: Decl. of Megan E. Gervase In Support of
     Defendant NAVTEQ Corp.'s Opposition to Plaintiffs' Motion for Leave to Submit Additional Expert
26   Disclosure ("*Gervase I*"); Decl. of Megan E. Gervase In Support of Defendant NAVTEQ Corp.'s Motion
     to Strike Declarations in Support of Plaintiffs' Opposition ("*Gervase II*"); and Decl. of Megan E.
27   Gervase In Support of Defendant NAVTEQ Corp.'s Motion for Summary Judgment on All Claims Other
     Than Tying ("*Gervase III*").

28

1   leave to submit an additional expert disclosure.  It was completed about three weeks later on

2   November 5, 2007.  *See Baily II*, Ex. 3.

3          **2.**    **Analysis**

4         The briefing does not clearly explain what legal standard covers Tele Atlas' request to submit

5   additional expert testimony.  Tele Atlas' motion argues that the court has "vast discretion" to

6   supervise discovery and suggests that NAVTEQ will not suffer undue prejudice from allowing an

7   additional expert report.  NAVTEQ argues that Federal Rule of Civil Procedure 37(c)(1)'s bar on

8   undisclosed testimony applies, and that Tele Atlas may only succeed if it demonstrates "substantial

9   justification" for its failure to disclose or that its failure was "harmless."

10        The court does not believe that Rule 37(c)(1) controls the analysis since Tele Atlas has made

11   its additional expert disclosure.  On the other hand, the "vast discretion" alluded to by Tele Atlas

12   does not apply where the court has entered a binding case management order.  In its reply, Tele

13   Atlas identifies Rule 16(b)(4)'s "good cause" standard for modifying a case scheduling order.  This

14   is the proper standard for reviewing Tele Atlas' request, as Tele Atlas is seeking to fundamentally

15   alter the case management order by creating an additional round of expert disclosure where none

16   existed before.  Put simply, Tele Atlas wants to change how the case management order determined

17   which party gets to have the last word on expert testimony.

18        The court may only modify the case management order upon a showing of "good cause."

19   *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087-88 (9th Cir. 2002); *see also Hynix*

20   *Semiconductor Inc. v. Rambus Inc.*, 250 F.R.D. 452,  2008 WL 687252 (N.D. Cal. 2008).  Whether a

21   party has demonstrated "good cause" may depend on their diligence in seeking relief from the case

22   management order.  *Zivkovic*, 302 F.3d 1087-88; *Hynix Semiconductor*, 2008 WL 697252 at *4-*5.

23   Whether the opposing party will be prejudiced is another important factor in determining whether to

24   modify a case management order under Rule 16(b)(4).  *Hynix Semiconductor*, 2008 WL 697252 at

25   *4 & fn. 6.

26        Tele Atlas has failed to establish "good cause."  As a preliminary matter, it has failed to

27   demonstrate diligence in seeking to modify the case management order.  Tele Atlas argues that it

28

**PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                             4

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    was diligent in seeking leave to modify the case management order because it contacted NAVTEQ

2    about doing so "within days of receiving NAVTEQ's expert's disclosure on August 30, 2007" and

3    that NAVTEQ failed to inform Tele Atlas that it would oppose a motion for leave until October 15,

4    2007, the day Tele Atlas filed this motion. The court disagrees. As conceded by Tele Atlas, the

5    schedule for expert disclosures was set back in August 2005. At that time, the parties agreed that the

6    party with the burden of proof on an issue would submit its expert report first, which would then be

7    followed by any expert disclosure from the opposing party and nothing more. Two years later – and

8    "within days of receiving NAVTEQ's expert's disclosure" – Tele Atlas sought to modify the case

9    management order to allow it to file an additional expert report. This is not diligence; two years had

10    elapsed. Tele Atlas had a change of heart regarding the expert disclosure rules when it realized it

11    had failed to produce evidence on a variety of topics.

12       Tele Atlas also fails to meaningfully address the prejudice to NAVTEQ that would occur

13    were the court to grant its motion for leave. In its motion, Tele Atlas does *not* suggest that

14    NAVTEQ may also file another rebuttal report. On the contrary, Tele Atlas suggests that NAVTEQ

15    will not be prejudiced by the additional report and that any prejudice will be cured by its offering Dr.

16    Neels for an additional 3.5 hours of deposition. Tele Atlas analogizes that, "Just as a submission of

17    a reply brief on a motion does not require a new round of briefing, the submission of Neels' Rebuttal

18    Report prior to trial does not require a new round of expert discovery or a delay in the current

19    schedule." Reply at 11:1-4. Motion briefing is not an apt analogy for expert disclosures in this case

20    though, precisely because the case management order contemplated that the opposing party on an

21    issue would receive the last opportunity to introduce evidence on it. Were the court to grant Tele

22    Atlas' request, NAVTEQ would be deprived of any opportunity to submit expert testimony to rebut

23    Dr. Neels' new opinions and disprove Tele Atlas' claims. While this may be a permissible way to

24    structure expert disclosures *a priori*, shifting from a report-rebuttal system to a report-rebuttal-

25    additional report system is extremely prejudicial as the case approaches trial.

26       NAVTEQ will also be substantially prejudiced if Tele Atlas is permitted to supplement the

27    record after expert discovery has closed in response to NAVTEQ's motions for summary judgment.

28

United States District Court
For the Northern District of California

1   While Tele Atlas now claims that it "has *not* sought leave to submit the Rebuttal Report in order to

2   rely on it with respect to opposing NAVTEQ's motions for partial judgment," reply at 9:23-25

3   (emphasis in original), Tele Atlas' motion argued that "NAVTEQ will have ample time to address

4   Dr. Neels' additional disclosure in the context of its motion for summary judgment and its

5   preparation for trial . . . Tele Atlas will be prepared to submit Dr. Neels' additional expert disclosure

6   as early as October 26, 2007, several weeks before the deadline for NAVTEQ's reply briefs on

7   summary judgment[.]" Mot. at 3:21-26.  Indeed, Tele Atlas annotated its opposition to NAVTEQ's

8   summary judgment motions with footnotes citing to Dr. Neels' rebuttal expert report on pages 6, 39,

9   and 46.  Though Tele Atlas now claims that it was *not* seeking leave to submit additional evidence to

10  stave off summary judgment, its own briefs strongly suggest otherwise.

11         The time for modifying the expert disclosure rules passed months, if not years, ago.  Tele

12  Atlas has not been diligent and its proposed alteration to the case management order would

13  substantially prejudice NAVTEQ.  Accordingly, the court finds that Tele Atlas has not met its

14  burden of demonstrating good cause and denies Tele Atlas leave to submit Dr. Neels' rebuttal expert

15  report.

16         **B.    NAVTEQ's Motion to Strike Various Declarations**

17         NAVTEQ moves to strike various declarations filed with Tele Atlas' opposition to its

18  motions for summary judgment.  Obviously, a declaration supporting a party's summary judgment

19  brief "must be made on personal knowledge, set out facts that would be admissible in evidence, and

20  show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  It is an

21  abuse of discretion for a court to consider declarations that do not comply with Rule 56(e)(1)'s

22  requirements; for example, a court cannot consider a declaration that simply repeats inadmissible

23  hearsay.  *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001).

24         Tele Atlas invokes the notion that "as a general principle [the courts] treat the opposing

25  party's papers more indulgently than the moving party's papers" and that a counter affiant's

26  declaration should be "liberally construed."  *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.

27  1985).  Read in context, these statements refer to the requirement that a court view the facts on

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                                                6

United States District Court

For the Northern District of California

1  summary judgment in the light most favorable to the non-movant in determining whether there is a

2  genuine issue of material fact. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,

3  210 F.3d 1099, 1102-03 (9th Cir. 2000). These general principles do not, however, relax the

4  requirement that a declaration supporting or opposing a motion for summary judgment must comply

5  with Rule 56(e)(1). The rule's plain text does not distinguish between supporting and opposing

6  declarations. To the extent that *Lew* suggests that courts should be "indulgent" in applying the rules

7  of evidence to the opposing party's declaration, it cannot be reconciled with Rule 56(e)(1)'s text.

8  The court therefore does not read *Lew* so broadly.

9          **1.    Quan Vu and Steven Notaro**

10      NAVTEQ moves to strike paragraph 6 of Quan Vu's declaration, which states that:

11      During 2006 and 2007, Cliff Pemble and Jennifer Herve du Penhoat have expressed
12      to me on numerous occasions that ███████████████████████

13

14  Mr. Vu's declaration simply repeats the alleged statements of Garmin employees. Tele Atlas

15  recognizes that Mr. Vu's statement is hearsay, but argues that it is admissible under Federal Rule of

16  Evidence ("FRE") 807, the "residual exception" to the hearsay rule.

17      Rule 807 permits the court to admit hearsay that does not fall under an exception under Rules

18  803 or 804 if it has "equivalent circumstantial guarantees of trustworthiness" and "(A) is offered as

19  evidence of a material fact; (B) is more probative on the point for which it is offered than any other

20  evidence which the proponent can procure through any reasonable efforts; and (C) the general

21  purposes of these rules and the interests of justice will best be served by admission of the statement

22  into evidence." The rule is intended to give trial courts flexibility in administering the hearsay rule.

23  *See United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994). Nonetheless, that flexibility is

24  to be used "rarely" and in extraordinary circumstances. *Fong v. American Airlines, Inc.*, 626 F.2d

25  759, 763 (9th Cir. 1980). It cannot be used to admit "run-of-the-mill" hearsay. *Id.*

26      Tele Atlas argues that such extraordinary circumstances exist here because it has been

27  "thwarted" in obtaining testimony regarding the subjects repeated in Mr. Vu's declaration. Tele

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                              7

United States District Court
For the Northern District of California

1   Atlas was allegedly "thwarted" by Garmin's 30(b)(6) witness' refusal to answer questions arguably

2   addressed to those subjects in deposition.  Garmin's counsel objected because he did not believe the

3   protective order in place adequately guarded his client's trade secrets.  *See Baily III*, Ex. 2 at 55:19-

4   56:16.  Tele Atlas' counsel followed up by sending a letter to Garmin objecting to the refusal to

5   answer on August 10, 2007.[3]  *See Baily III*, Ex. 4.  On August 21, 2007, Garmin's Senior Patent

6   Litigation Counsel responded that he believed the objections were well-taken, that Garmin's 30(b)(6)

7   witness had nevertheless provided substantive answers to Tele Atlas' questions, and that Garmin

8   would not provide any further deposition testimony.  *See* Johnstone Decl., Ex. A.  Since receiving

9   the letter from Garmin, Tele Atlas appears to have abandoned its attempts to procure testimony from

10  Garmin by filing a motion to compel.

11          The court sympathizes with the difficult decision of whether to file a motion to compel

12  against a firm that one wishes to secure as a customer.  A motion to compel is easily filed from a

13  legal perspective.  However, from a business perspective focused on satisfying customers, winning

14  their business, and keeping them happy, the notion of filing a motion to compel a potential customer

15  to provide additional discovery understandably raises concern.  This difficulty is amplified by the

16  timbre of Garmin's counsel response, where he wrote, "For what it is worth, we are sorry that you

17  feel we did not comply with our obligations with respect to your subpoena.  This certainly has not

18  been an enjoyable experience for us – particularly in light of the fact that Garmin was actively

19  negotiating with both parties at the time of the deposition."  *Id.*  Nevertheless, Tele Atlas has the

20  legal tools to obtain the evidence it believes it needs.  Tele Atlas has chosen to forgo those tools to

21  not risk alienating Garmin and losing Garmin's business.  The choice to further Tele Atlas' business

22  interests cannot in turn be used to justify admitting hearsay statements against NAVTEQ under Rule

23  807 and prejudicing NAVTEQ.  Because the proffered hearsay is not more probative than any other

24  evidence that could be procured through reasonable efforts, it is inadmissible.  The court also finds

25  _____

26          [3]      Tele Atlas' excerpts from the Garmin 30(b)(6) deposition do not reveal the date of the deposition.  It appears from another letter that the deposition was scheduled for June 1, 2007.  *See Baily*

27  *III*, Ex. 3.  If two months in fact elapsed between the two events, Tele Atlas does not appear to have been especially diligent in resolving the problems that arose at the deposition.

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
    JUDGMENT
    C-05-01673 RMW
    TSF                                                            8

1   that the trustworthiness of the statements is questionable since they are offered through an employee

2   of the party who has an interest in the contents of the statements.

3          Likewise, NAVTEQ moves to strike paragraphs two and three of the declaration of Steven

4   Notaro. The Notaro Declaration also simply repeats statements allegedly spoken by Garmin

5   employees to Mr. Notaro. Such statements are inadmissible hearsay, and evidence related to the

6   statements could have procured from Garmin. Tele Atlas has chosen not to obtain such evidence

7   directly from Garmin. It therefore cannot rely on the residual exception to the hearsay rule.[4]

8          Based on the foregoing, the court grants the motion to strike paragraph 6 of the Vu

9   Declaration and Paragraphs 2 and 3 of the Notaro Declaration.

10          **2.   Dr. Neels**

11          In opposing NAVTEQ's motions for summary judgment, Tele Atlas included a declaration

12   from Dr. Neels. Paragraph 9 incorporates his additional rebuttal report, which the court has already

13   denied Tele Atlas leave to submit. Accordingly, the court grants NAVTEQ's motion to strike this

14   portion of Dr. Neels' declaration. The court does not rely on any other portion of Dr. Neels'

15   declaration, and therefore does not reach the remainder of NAVTEQ's motion to strike it.

16          **3.   Alexander Ribbink**

17          NAVTEQ also moves to strike the third and fourth paragraphs of the Declaration of

18   Alexander Ribbink, arguing that he cannot possess personal knowledge despite his declaration to the

19   contrary, and, therefore, the declaration does not satisfy Rule 56(e)(1). *Accord Bliesner v.*

20   *Communication Workers of Am.*, 464 F.3d 910, 915 (9th Cir. 2006). NAVTEQ's basis for this

21   argument is that Mr. Ribbink did not join TomTom as its Chief Operating Officer until November

22   2003, therefore, he cannot have personal knowledge of what happened at TomTom before then. The

23   statements at issue are:

24          Several years before NAVTEQ approached TomTom regarding selling map data, ████████

25

26          [4]       NAVTEQ also faults Tele Atlas for failing to properly disclose Steven Notaro as a person

27   with knowledge pursuant to Rule 26. Because the court finds that the only relevant paragraphs of Mr. Notaro's declaration are inadmissible hearsay, it does not reach this issue.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT
C-05-01673 RMW
TSF                                                                    9

United States District Court
For the Northern District of California

In approximately 2002, TomTom released its first personal navigation product. Starting shortly after the release of that product.

Tele Atlas first argues that the motion to strike should be denied simply because Mr. Ribbink has sworn that he has personal knowledge of the matters set forth in his declaration. Tele Atlas relies on *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, 1238-39 (S.D. Ala. 2006), which held that "when an affiant avers that his statements are based on personal knowledge, a district court is 'bound to accept [such] statements as true, unless the context demonstrate[s] otherwise.'" However, the events Mr. Ribbink testifies about occurred long before he began at TomTom, thereby calling into question his personal knowledge.

Personal knowledge of certain aspects of a business may be inferred from a person's position in that business. *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000); *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1200-02 (C.D. Cal. 2007). Here, Mr. Ribbink attests to TomTom's various business dealings and justifications for its actions before he began working for TomTom. As the COO of TomTom currently, it is a reasonable inference that he has familiarity with TomTom's business, including the history of TomTom's relationships with its data suppliers and TomTom's beliefs regarding those suppliers' products. Accordingly, the court denies NAVTEQ's motion to strike the third and fourth paragraphs of the Ribbink declaration.

### C.   Motions to Strike Drs. Kerr and Neels's Declarations

The parties each file motions to strike the opposing side's economic expert, largely basing their arguments on the rules governing the admissibility of expert testimony. Because the court

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   minimally relies on these declarations to address the motions for summary judgment, the court

2   denies the motions without prejudice to the parties' renewing their concerns about each other's

3   expert's competence to testify before trial.

## II.   TELE ATLAS'S *PER SE* TYING CLAIM UNDER SECTION 1

5        NAVTEQ's first motion for summary judgment addresses Tele Atlas's claims that NAVTEQ

6   ties licenses to various patents to sales of NAVTEQ's map databases resulting in a *per se* violation of

7   the antitrust laws.

### A.   Licensing Background[5]

9        NAVTEQ and Tele Atlas create and license digital map data.  Among other uses, digital map

10   data is essential to navigation systems embedded in car dashboards and to portable navigation

11   systems included in multi-purpose devices like a Blackberry or iPhone or in dedicated navigation

12   devices, like those produced by Garmin, TomTom, and others.

13        In addition to creating and compiling map data, NAVTEQ owns overs 200 patents and has

14   over 100 patent applications pending covering map-related technologies. *See, e.g., Baily IV*, Ex. 82

15   at 4 (NAVTEQ business development presentation).  In its complaint, Tele Atlas accused NAVTEQ

---

[5]   Because this matter arises on two motions for summary judgment, the court draws these background facts from the declarations submitted by the parties, deposition testimony, answers to interrogatories and undisputed facts. *See* Fed. R. Civ. P. 56(e). The court considers this evidence in the light most favorable to the non-moving party, i.e., Tele Atlas. However, the court does not credit material submitted with declarations that would not be admissible at trial. *See Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

NAVTEQ complains generally that Tele Atlas's opposition "engages in subterfuge," "makes assertions unsupported by the record . . . cross-references nonexistent evidence, and engages in more factual overstatements than could possibly be corrected by this reply." NAVTEQ does not, however, specifically object to any portion of the record other than the issues discussed above and *Baily IV*, Exhibit 80 (discussed *infra*).

This raises the issue of whether the trial court may exclude evidence as inadmissible absent an objection. Some Ninth Circuit authority suggests that it is an abuse of discretion to exclude evidence from the record on summary judgment absent an objection. *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 846-47 (9th Cir. 2004). Other authority emphasizes that a trial court may only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). It is unclear in *Orr* whether the opposing party objected to *every* exhibit lodged by the plaintiff, or if the trial court *sua sponte* made evidentiary rulings excluding all but three exhibits. *See id.* The court does not resolve this tension because it is not necessary to do so to decide these motions. The court therefore strikes only evidence to which NAVTEQ has properly objected. Nevertheless, the court notes that many exhibits lodged by Tele Atlas in support of its opposition are flagrant hearsay.

United States District Court
For the Northern District of California

1   of using its ability to license U.S. Patent Nos. 5,161,886 (the "3D Patent") and 6,735,515 (the

2   "Electronic Horizon patent"), as well as their foreign counterparts, to force licensees to also license

3   NAVTEQ's map databases. *See* Third Amended Complaint, *Tele Atlas N.V. v. NAVTEQ Corp.*, C-

4   05-01673, Docket No. 53 ¶¶ 55-75 (N.D. Cal. Mar. 29, 2007).

5              **1.**      **NAVTEQ's Acquisition of the 3D Patents**

6        In December 2003, NAVTEQ entered into an exclusive license with Koninklijke Philips

7   Electronics N.V. for the right to make, use, and sell portable devices and software that read on the

8   3D Display patent and to grant sublicenses. *See* Decl. of Shane Ramsey, Ex. D.  Shortly afterward,

9   NAVTEQ also obtained an exclusive license to make, use, and sell non-portable devices built into

10   cars, as well as the right to grant sublicenses to make such products. *Id.* at Ex. E.

11        The licensing negotiations appear to have begun in late November, when Judson Green,

12   NAVTEQ's CEO, contacted Philips about obtaining a license to the 3D Patents. *See Baily IV*, Ex.

13   26.  In proposing a licensing relationship, Mr. Green suggests that ███████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████ *Id.*  Mr.

16   Green's email is vague, but it notes that NAVTEQ had "an immediate opportunity where having

17   ownership or control of the 3D patents could prove useful."  The testimony of Frank Kozak,

18   NAVTEQ's Chief Patent Counsel, sheds some light on NAVTEQ's motivation.  When asked what

19   "strategic use" NAVTEQ intended to pursue, Mr. Kozak answered that ████████████████████

20   ███████████████████████████ *Id.*, Ex. 27 at 60:4-8.  To be clear, Mr. Kozak testified

21   that ███████████████████████ *Id.* at 60:9-10.  Mr. Kozak lacked, however, an

22   "informed judgment" as to the nature of the "immediate opportunity" referred to in Mr. Green's

23   email. *Id.* at 60:11-21.

24              **2.**      **NAVTEQ's Relationship with TomTom**

25        Tele Atlas contends that the "immediate opportunity" was to force TomTom to license

26   NAVTEQ's map data.  TomTom's CEO Alexander Ribbink states that prior to 2003, TomTom

27   purchased its map data from Tele Atlas exclusively.  Ribbink Decl. ¶ 4.  Indeed, by September 2003,

28



1    NAVTEQ's Northern Europe Sales Manager Malcolm Edwards believed that NAVTEQ was ████

2    ██████████████████████████████████████. *See Baily IV*, Ex. 39.

3         Thus, in the fall of 2003, Mr. Ribbink claims that TomTom received a letter from NAVTEQ

4    noting that NAVTEQ possessed the rights to "the 3D patents." *Id.* ¶ 5.[6]  NAVTEQ ██████████

5    ████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████. *Id.* ¶ 6.  At the meeting, ██████████████

7    █████████████████████████████████████████████████████████

8    ██████████████████████████████████ *Id.*  TomTom subjectively "felt ██████████

9    ████████████████████████████████████████████ *Id.* ¶ 8.

10   Nonetheless, ████████████████████████████████████████████████

11   ██████ *Id.* ¶ 11.  NAVTEQ then sued TomTom in Germany for infringing one of the foreign

12   counterparts to the 3D patent. *Id.* ¶ 12.

13        Internal NAVTEQ documents submitted by Tele Atlas corroborate some of Mr. Ribbink's

14   timeline and add further dates.  An internal NAVTEQ email sent to Frank Kozak (NAVTEQ's Chief

15   Patent Counsel) relates ██████████████████████████████████████████████

16   *See Baily IV*, Ex. 40.  But a NAVTEQ meeting summary from February 2004 suggests ██████

17   ████████████████████████████████████████████████

18   ██████████████████ *Id.*, Ex. 31.  Still, an internal NAVTEQ email from March 9, 2004

19   shows █████████████████████████████████████████████████████████████

20   ██████ *Id.*, Ex. 45.  A previous email and slideshow from March 5, 2004 suggests that NAVTEQ

21   ████████████████████████████████████████████████████████████████████████

22   ██████████████ *Id.*, Ex. 46.  Nonetheless, a NAVTEQ meeting summary from March 16, 2004

23   hints that NAVTEQ ████████████████████████████████████████████

24   ██████████████████ *Id.*, Ex. 49.

25

26        [6]      Mr. Ribbink's receipt of the letter appears to predate NAVTEQ's agreement with Philips,
27   as well as the beginning of the licensing negotiations between NAVTEQ and Philips.  In fact, the letter
     appears to have been sent to TomTom on December 17, 2003. *See Baily IV*, Ex. 42.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                          13

United States District Court
For the Northern District of California



An internal NAVTEQ memo to its CEO Judson Green dated August 4, 2004, supplies further details of the NAVTEQ-TomTom negotiations. *See Baily IV*, Ex. 50.  It suggests that NAVTEQ sent its first notice to TomTom in December 2003 regarding the 3D patent.  *Id.*  It then indicates █

█ *Id.*  In the event that those attempts failed, █

*Id.*  The memo also conveyed that █

*Id.*  The NAVTEQ employee who wrote the memo believed █

. *Id.*  Meanwhile, NAVTEQ internally █

. *See id.*, Ex. 57.

Another NAVTEQ meeting summary, this one from September 2004, indicates that █

*Id.*, Ex. 32.  TomTom refused to license NAVTEQ's map data, and █

*Id.*, Ex. 55.

Tele Atlas then submits Exhibit 59, which it claims are NAVTEQ's "talking points" regarding the German litigation.  While far from a sure thing, there is evidence sufficient to support a finding that the document is authentic (it was produced by NAVTEQ) and sufficient indicia that it is more likely than not that the email is a statement of a NAVTEQ agent (there is a NAVTEQ logo on an image in the body of the email and the contents of the email reflect sensitive, internal NAVTEQ information).  That aside, the talking points place the filing date of NAVTEQ's lawsuit against TomTom sometime in late October and in Germany.  *See Baily IV*, Ex. 59.  The talking

1  points ████████████████████████████████████████. *Id.* (emphasis in

2  original). The talking points note that the recipient ████████████████████

3  ██████████████████████████████████████████████████████████████████

4  ██████████████████████ *Id.*

5       Following the filing of the lawsuit, it appears that TomTom prepared for its initial public

6  offering. *See Baily IV*, Ex. 60. NAVTEQ appears to have become aware of the impending IPO on

7  December 30, 2004, and internally felt that ████████████████████████████

8  ████████████████ *Id.*

9       According to Mr. Ribbink, TomTom and NAVTEQ settled their patent dispute in March of

10 2005. Ribbink Decl. ¶ 13. ████████████████████████████████████

11 ████████████████████████████████████████████████ *Id.* ████████

12 ████████████████████████████████████████████████████████ *Id.*

13 However, ████████████████████████████████████ *Id.* ¶ 14. The first

14 agreement settled the patent litigation ███████████████████████████████

15 ████████████████████ *Id.* The second agreement ████████████████████

16 ██████████████████████████████████████████████████████████████████

17 ████████████████ *Id.* ¶¶ 13, 15. The second agreement also gave ████████████████

18 ████████████████ *Id.* ¶ 14. Mr. Ribbink declares that ████████████████████

19 ████████████████████████████ *Id.* ¶ 16.

20      Tele Atlas also submitted an unsigned term sheet indicating ████████████████

21 ████████████████████████████ *Baily IV*, Ex. 61. The term sheet includes █

22 ██████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████████████████

25 *Id.* ████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████ *Id.*

28 **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                15

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    NAVTEQ has submitted the two license agreements.  *See* Ramsey Decl., Exs. N & W.  The

2    patent license agreement ███████████████████████████████████████████████████████

3    *Id.*, Ex. N.  The agreement ████████████████████████████████████████████████████████

4    ████████████████.  *Id.*  With respect to royalties, the license states that ████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    *Id.*  The agreement requires TomTom ██████████████████████████████████████████

8    █████████████████████████████████████████████  *Id.*  TomTom signed the

9    agreement on April 25, 2005, and NAVTEQ signed it on May 2, 2005.  *Id.*  Meanwhile, the data

10   license is a largely form agreement that includes ████████████████████████████████████

11   ████  *Id.*, Ex. W.  It became effective April 18, 2005, about two weeks earlier.  *Id.*

### 3.    NAVTEQ's Relationship with Navman

13   Navman[7] also manufactures personal and vehicle navigation devices.  *Baily IV*, Ex. 64 at 12-

14   14.  Navman appears to have been negotiating with both Tele Atlas and NAVTEQ regarding map

15   data in early 2003, *id.* at 18-19, and NAVTEQ believed that ████████████████████████████

16   ████████████████████████████████████████████████████████████████████  *Id.* at

17   21.  By October 2003, Navman had informed NAVTEQ that █████████████████████████████

18   ████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████  *Id.*, Ex. 65 (email of Bruno Bourguet, a NAVTEQ

20   employee).  NAVTEQ later understood that Navman ████████████████████████████████████

21   ████████████████████████  *Id.*, Ex. 66 (email of Daniel Bue, a NAVTEQ employee).

22   In August 2004, NAVTEQ worked to reacquire Navman's business.  *See id.*, Ex. 67.

23   Nonetheless, NAVTEQ believed that ██████████████████████████████████████████████

24   ████████████████████████████████████  *Id.* at NVT-TA005644.

25   NAVTEQ appears to have begun negotiating with Navman by October 8, 2004 at the latest.

26   ────────────────────────

27   [7]    Brunswick New Technologies purchased a controlling stake in Navman at some point
      before December 2003.  *Baily IV*, Ex. 64 at 3, 11.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
      JUDGMENT
      C-05-01673 RMW
      TSF

                                              16

1   *Id.*, Ex. 73.  An email from NAVTEQ to Navman reflected that a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*[8]

5        Tele Atlas submits evidence of the further negotiations between NAVTEQ and Navman from

6   November 2004.  *Id.*, Exs. 28; 71.  In early November, NAVTEQ sent Navman a term sheet for

7   licensing its map data.  *Id.*, Ex. 71.  A NAVTEQ employee (Stephen Smith) was ▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  NAVTEQ

9   believed that Navman ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  In assessing Navman's reaction to the 3D patent

12   royalty request, Mr. Smith stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮ *Id.*  Accordingly, he suggested that NAVTEQ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮. *Id.*

16        Mr. Smith's email reporting on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  Mr. Smith stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮ *Id.*  This portion of the email permits an inference that Navman was aware of NAVTEQ's

22   litigation against TomTom.

23        Another email from a week later suggests that a NAVTEQ employee believed that ▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ─────────────────

26   [8]     The court sustains NAVTEQ's objection to the obvious hearsay in Exhibit 80.  It is not

27   the only hearsay polluting the record in this case.  A non-exhaustive list comprises exhibits 62, 63, 65, 68, 72, 73, 74, 75, 78, 79, 81 and 90 from the *Baily IV* declaration.  All raise obvious hearsay concerns, but NAVTEQ has not specifically objected to their presence in the record.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT
C-05-01673 RMW
TSF

United States District Court
For the Northern District of California

1  ██████████████████████████████ *Id.* █████████████████████████████████

2  ████████████████████████ wrote the NAVTEQ employee. *Id.* A third NAVTEQ employee

3  asked for more specifics because ██████████████████████████████████████

4  ██████████████████████████████████ *Id.* Neither party provided

5  any additional emails from this exchange.

6      By December 2004, NAVTEQ was proposing various licensing options to Navman. *See id.,*

7  Ex. 69. In one email, NAVTEQ made two proposals, █████████████████████████

8  ███████████████████████████████████████████████████████████████

9  ██████████████████████████████ *Id.* The proposed agreements also required ██████

10 ██████████████████████████████ *Id.* One proposal required ████████████████

11 ████████████████████████████████████████; the other proposal ███████████

12 ████████████████████████████████████████████████████████████ *Id.*;

13 *see also id.,* Ex. 70 at 16-17 (pricing proposal slide presentation confirming that the offers were

14 conveyed).[9]

15     The negotiations led to a term sheet memorializing the discussions signed on January 25,

16 2005. *Id.,* Ex. 76. The term sheet indicates that NAVTEQ and Navman ████████████████

17 ███████████████████████████████████████████████████████████████

18 ████████████████████████ *See id.* The term sheet also reflects ████████████████

19 ████████████████████████████████████████████████████████████ *Id.*

20     Tele Atlas does not submit the actual license agreements between NAVTEQ and Navman.

21 NAVTEQ does. NAVTEQ entered a patent license agreement with Navman on December 1, 2005.

22 Ramsey Decl., Ex. F. The agreement states that ██████████████████████████████

23 ███████████████████████████████████████████████████████████

24 ████████████████████████████████████████████ *Id.* § 3.01. ███████

25

26     [9]    Tele Atlas also submits an email from Brunswick New Technologies' general counsel

27 to NAVTEQ. *Id.,* Ex. 68. This email is inadmissible hearsay, and the court grants it no weight. The
same email also appears in the record as Exhibit 72 to the *Baily IV* declaration.

28 **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF

United States District Court
For the Northern District of California



1  ███████████████████████████████████████████████████████████

2  ███████████████████████    *Id.*

3        Two weeks later, NAVTEQ and Navman entered into the data license referred to in the

4  patent license. *See* Ramsey Decl., Ex. Q. Two weeks after that, NAVTEQ and Navman executed a

5  license defining the scope of the map data license. *See id.*, Ex. R. In the January 1, 2006, Territory

6  License No. 1, Navman agreed to pay ████████████████████████████████████

7  ████████. *Id.* at 8-9. Navman also agreed to pay licensing fees for ████████████████ units.

8  *Id.* at 3.

9        **4.    NAVTEQ's Relationships with Other Navigation Device Manufacturers**

10       NAVTEQ broached the subject of its patent portfolio with other map data customers. Tele

11  Atlas submits three NAVTEQ slide shows to support the inference that NAVTEQ publicized its 3D

12  patents to force customers to license NAVTEQ map data. In a May 4, 2006 presentation to

13  Samsung, NAVTEQ noted that it had "████████ patents worldwide." *Baily IV*, Ex. 82 at NTV-

14  TA829696.[10] A later slide notes that ██████████████████████████████████████ and

15  refers to additional details later in the proposal. *Id.* at NVT-TA829709. An appendix to the

16  presentation on slide 61 (the last slide of the presentation) provides details regarding the 3D patents.

17  *Id.* at NVT-TA829753. The slide notes that ████████████████████████████████

18  ████████████████████████ *Id.* It also explains that ████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████ *Id.* Tele Atlas

21  submits no evidence that Samsung entered into a license agreement with NAVTEQ.

22       In a January 27, 2006 presentation to BMW, NAVTEQ noted that it "hold[s] ████████

23  patents worldwide." *Baily IV*, Ex. 83 at NVT-TA666058. The presentation does not appear to

24  ────────────────────────────

25       [10]    It seems unlikely that the slide show submitted by Tele Atlas as evidence was the actual
    presentation given by NAVTEQ to Samsung. For example, slide 13 of the presentation is blank except
26  for the header "Map Update." *Id.* at NVT-TA829705. Slide 46 explains that the ████████████
    is discussed on "slide 39," but slide 39 does not discuss ████████. *Id.* at NVT-TA829731;
27  NVT-TA829738. However, it is a reasonable inference on summary judgment that the slides were
    presented and that the completed slides were not changed before the presentation.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    mention any specific patents or contain a licensing proposal, and Tele Atlas points to no such

2    evidence. *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1029-31 (9th Cir. 2001)

3    (requiring a party to identify what evidence they argue creates a triable issue of fact). Nor does Tele

4    Atlas point to any evidence in the record that NAVTEQ and BMW entered into a map data or patent

5    license.

6          In a February 23, 2005 presentation to MiTAC, NAVTEQ noted that it "hold[s] more than

7    ▆▆▆▆▆▆▆▆ patents" ▆▆▆▆▆▆▆▆▆▆▆▆▆ *Baily IV*, Ex. 84 at NVT-

8    TA376556. The presentation includes ▆▆▆▆▆▆▆▆

9    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* Tele Atlas points to no other slide

10   in the presentation to support its contentions.

11         In addition to noting its patent portfolio in some of its sales presentations, NAVTEQ also

12   entered into agreements with various device makers. Tele Atlas urges the inference that "Cobra now

13   purchases map data from NAVTEQ because it believes it may otherwise be sued for patent

14   infringement" based on the following testimony of William Chamberlain (who appears to have been

15   Cobra's 30(b)(6) witness):

16         Q:  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

17         A:  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

18         Q:

19         A:  ▆▆▆▆▆▆▆▆

20   *Baily IV*, Ex. 85 at 198:19-199:3. The followup question from the deposition submitted, but not

21   cited, by Tele Atlas was "My original question was ▆▆▆▆▆▆▆▆▆

22   ▆▆▆▆▆▆▆ The answer was "No." *Id.* at 199:4-8.

23         DeCarta licensed the 3D patents from NAVTEQ on the ▆▆▆▆▆▆▆

24   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

25   ▆▆▆ *See Baily IV*, Ex. 86. DeCarta signed the license on July 31, 2006 (NAVTEQ appears to

26   have signed it on September 28, 2006). *Id.* DeCarta appears to have entered into a map data license

27

28   **<u>PUBLIC REDACTED</u>** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                           20

1   a few months after the patent license was signed. *See Baily IV*, Ex. 87.[11]

2       NAVTEQ also dealt with Via Michelin.  In internal discussions regarding NAVTEQ's

3   attempts to sell map data to Via Michelin, NAVTEQ discussed ████████████████████

4   ████████████████████████████ *Baily IV*, Ex. 88.  One employee proposed

5   ██████████████████████████████████████████████████████.

6   Mr. Ramsey disagreed ████████████████████████████████████████

7   ████████████████████████████████████████████████ *Id.*  By

8   November 2004, Via Michelin appeared to be close to signing a map data license. *Id.*, Ex. 89.[12]

9   Tele Atlas introduces no evidence that Via Michelin ever licensed the 3D patents, nor does it

10  introduce evidence of Via Michelin's actual map data license with NAVTEQ.  Mr. Ramsey declares

11  that NAVTEQ ████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████.  Ramsey Decl. ¶ 5.  He also states that ████████████████████████

14  ██████████

15       NAVTEQ also has a data licensing relationship with Medion.  Medion approached

16  NAVTEQ about expanding its licensing relationship in December 2005. *Baily IV*, Ex. 91; *see*

17  *also* Ramsey Decl. ¶ 4 (prior to then, Medion sublicensed NAVTEQ's data from Navigon).

18  NAVTEQ became Medion's preferred data supplier in early 2006. *Baily IV*, Ex. 92 (data license);

19  *see also* Exs. 93-95 (amendments).  Medion also licensed the 3D patents from NAVTEQ in what

20  appears to be late 2006, though the separate patent license was referenced in the first amendment

21  (dated July 3, 2006) to the data license agreement. *See id.*, Exs. 94, 96.

---

23       [11]    Tele Atlas also submits that DeCarta has previously used Tele Atlas data and that
24  DeCarta exclusively used NAVTEQ data after entering the patent and map data license agreements.
     Nothing in the cited exhibits (comprising in total the patent license and the map data license) provides
25  evidentiary support for either inference.

26       [12]    Tele Atlas cites Exhibit 89, a string of internal NAVTEQ emails, for the proposition that
     "Via Michelin agreed to purchase data exclusively from NAVTEQ."  No such inference is possible from
27  the email, which noted that ████████████████████████████████ *Id.*

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1      **5.     NAVTEQ's Licensing of the Electronic Horizon Patent**

2          NAVTEQ has never licensed the Electronic Horizon patent. Ramsey Decl. ¶ 6. Tele Atlas

3   offers no evidence to support its March 29, 2007 allegation in its third amended complaint that

4   NAVTEQ "illegally ties its monopoly in Electronic Horizon Technology to the licensing of its

5   digital map data." TAC ¶ 71.

6      **B.     Existence of a Tying Arrangement**

7          NAVTEQ moves for summary judgment on Tele Atlas's claims based on tying by arguing

8   that there is no evidence in the record that NAVTEQ tied the licensing of map data to the licensing

9   of the 3D patents.[13] The first element of a tying claim under the antitrust laws is the existence of a

10  tying arrangement, or "an agreement by a party to sell one product but only on the condition that the

11  buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that

12  product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451,

13  461  (1992) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5-6, (1958)). Such a

14  condition does not have to be explicit, but can instead be implied from the course of dealing between

15  the parties.  Where the purchaser "actually and reasonably believes" that a tying condition exists and

16  where this belief stems from the seller's conduct, a tying condition might exist.  *E.g., Tic-X-Press,*

17  *Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1415-19 (11th Cir. 1989); X Areeda &

18  Hovenkamp, Antitrust Law ¶ 1754c (2d ed. 2004).  A purchaser's reasonable belief might result from

19  a "notorious" or well-known refusal to supply the tying product to a third party because the third

20  party did not buy the tied product.

21         The evidence submitted by Tele Atlas combined with the reasonable inferences to be drawn

22  from it suggest that there is a triable issue of fact as to whether NAVTEQ tied the licensing of the

23  3D patents to licensing its map data.  To begin, the record contains clear evidence that NAVTEQ at

24  least *hoped* to use the 3D patents to obtain long-term map data customers.  For example, NAVTEQ's

---

25

26      [13]     With respect to the Electronic Horizon patent, the court grants NAVTEQ's motion for
    summary judgment, as Tele Atlas has submitted no evidence to support its allegation that NAVTEQ tied
27      the Electronic Horizon patent to the a map data license, let alone any evidence that NAVTEQ ever
    licensed the Electronic Horizon patent.

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
    JUDGMENT
    C-05-01673 RMW
    TSF                                                              22

United States District Court
For the Northern District of California

1    overtures in approaching Philips to obtain the rights to the 3D patents indicate █████████

2    ███████████████████████████████████████████████████████████████████. This

3    intent by itself is probably insufficient to establish an illegal tying condition, *see* X Antitrust Law ¶

4    1755, but it is probative of whether NAVTEQ created an understood tying condition in conjunction

5    with the evidence discussed below.

6          NAVTEQ assiduously tried to become TomTom's map data supplier.  When those efforts

7    failed, NAVTEQ raised the issue of the 3D patents.  The (very self-interested) evidence from

8    TomTom suggests that TomTom felt it had to negotiate with NAVTEQ regarding map data to

9    forestall patent litigation.  When those negotiations foundered, NAVTEQ sued TomTom for patent

10   infringement.  The evidence suggests that NAVTEQ was not aware of TomTom's attempt to make

11   an initial public offering when it filed the suit, but it is reasonable to infer that this circumstance

12   amplified the pressure on TomTom.  It is also possible to infer that third parties may have observed

13   this series of events and believed that NAVTEQ timed its patent litigation to impact TomTom's

14   initial public offering.  Such timing can greatly increase the pressure on the defendant to settle.  *See,*

15   *e.g.,* Troy Wolverton & Margaret Kane, "PayPal Delays IPO," *CNET News.com* (Feb. 6, 2002) ("A

16   representative for Salomon Smith Barney, which is underwriting the IPO, confirmed that PayPal had

17   delayed the public offering because of the patent infringement suit."),

18   http://news.cnet.com/2100-1017-830235.html; Chris Gaither, "Google Settles Yahoo Patent Suit in

19   Anticipation of IPO," *Los Angeles Times,* C-1 (Aug. 10, 2004).

20         Tele Atlas has submitted evidence that at least Navman was aware of the pending litigation

21   between NAVTEQ and TomTom, and that Navman was worried about being sued too.  During the

22   negotiations with Navman, NAVTEQ's internal documents again reflect that NAVTEQ sought to use

23   the threat of infringement to convince Navman to license NAVTEQ's data.  NAVTEQ's documents

24   suggest that it prohibited its employees from raising the litigation with customers, but that its

25   employees could answer questions about the availability of the patents if asked.  Furthermore, given

26   the economic sophistication of the entities involved (even if some of the companies were small at the

27   time), it is  reasonable to infer that it is possible that other NAVTEQ map data customers were

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                                       23

United States District Court
For the Northern District of California

1    aware of the litigation with TomTom.  Finally, the map data license agreement between NAVTEQ

2    and TomTom permitted ████████████████████████████████████████████████████

3    ████████████████████████████████████████████ Ramsey Decl., Ex. W, Addendum E.

4    Drawing all inferences in Tele Atlas's favor, these pieces of evidence suggest that other map data

5    purchasers could have believed that NAVTEQ would license the 3D patents to them only if they also

6    licensed NAVTEQ's map data and that this belief stemmed from NAVTEQ's conduct in suing

7    TomTom and disseminating information about its licensing deal with TomTom.

8          NAVTEQ argues that there is no tying arrangement as a matter of law because the 3D patent

9    license agreements expressly permit the licensed manufacturer to use non-NAVTEQ data,

10   apparently for ████████████.  This is persuasive evidence that a tying condition did not exist,

11   especially when combined with testimony like that of Navman's CEO T.J. Chung that he considered

12   ████████████reasonable and that NAVTEQ did not condition Navman's 3D patent license on

13   Navman entering into a map data license.  *See* Johnstone Decl., Ex. C at 104:22-106:9.  But a

14   reasonable jury could conclude otherwise based on the evidence discussed above.

15         NAVTEQ cites a single case for the proposition that the term in its patent license permitting

16   the use of non-NAVTEQ data defeats the existence of a tying arrangement.  That case, *Microsoft*

17   *Corp. v. BEC Computer Co., Inc.*, 818 F. Supp. 1313 (C.D. Cal. 1992), does not speak to these facts.

18   In *BEC Computer*, the court dismissed a tying claim because Microsoft's "License Agreements

19   neither require defendants to purchase additional products from plaintiff nor prohibit defendants

20   from purchasing products similar to plaintiff's products from other suppliers." *Id.* at 1317.  This

21   makes sense, and would be the case here too because NAVTEQ's 3D patent licenses carefully

22   preserve the licensee's right to use non-NAVTEQ data and do not compel the licensee to purchase

23   NAVTEQ's map data.  If the 3D patent license agreements were the only evidence for the court to

24   consider, as before the court in *BEC Computer*, there would not be sufficient evidence to infer a

25   tying arrangement. But here, Tele Atlas does not argue that the 3D patent licenses create the tying

26   arrangement.  On the contrary, Tele Atlas's case is based on NAVTEQ's ancillary conduct in

27   negotiating the licenses, which distinguishes this case from *BEC Computer*.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                                   24

**United States District Court**
For the Northern District of California

1    Likewise, NAVTEQ argues that because it was economically feasible for licensees to pay

2    ███████████ license devices that did not use NAVTEQ data, there can be no tying arrangement.

3    While there is evidence in the record to support this argument (notably the testimony of Mr. Chung),

4    some evidence cuts the other way. Tele Atlas points out that NAVTEQ has remitted royalties to

5    Phillips pursuant to payments under the 3D patents only for TomTom and Navman. *See Baily IV*,

6    Ex. 192.[14] This suggests that no other licensed device manufacturer has ever used non-NAVTEQ

7    data with its devices, and supports the inference that other manufacturers consider it infeasible to use

8    non-NAVTEQ data. Of course, this may be due to other device manufacturers' having chosen

9    NAVTEQ as their preferred data supplier (which is discussed in more depth below). But for device

10   manufacturers that are contractually required to use NAVTEQ data, the ability to pay a royalty to

11   use non-NAVTEQ data is irrelevant. For example, Tele Atlas submits evidence that TomTom

12   would have used Tele Atlas data in its Rider product, but NAVTEQ required TomTom to switch to

13   NAVTEQ data as a condition of settling the patent litigation. In that situation, the possibility of

14   paying a royalty to use NAVTEQ's technology in devices not using NAVTEQ data is illusory

15   because a separate agreement requires the use of NAVTEQ data. Given the evidence in the record,

16   the court cannot agree that these provisions alone compel the finding that no tying condition existed

17   as a matter of law.

18   **C.    NAVTEQ's Market Power in the Tying Markets**

19   NAVTEQ also moves for summary judgment on Tele Atlas tying claims on the basis that

20   Tele Atlas has produced no evidence that NAVTEQ has market power in the tying markets, i.e., in

21   the technology markets associated with the two NAVTEQ patents. Because the court has already

22   granted summary judgment with respect to the Electronic Horizon patent, it addresses only the 3D

23   patents.

24   **1.    The Requirement of Establishing Market Power**

25

26   [14]    The document appears to be a spreadsheet of NAVTEQ's payments to Phillips. It bears

27   a NAVTEQ Bates stamp, permitting the court to infer that it is authentic and that it is an admission
pursuant to Rule 801(d)(2)(A).

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                                              25

1    Tele Atlas's tying claims "must be supported by proof of power in the relevant market rather

2  than by a mere presumption thereof." *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28,

3  42-43 (2006). The *Illinois Tool Works* case reversed a long line of authority that permitted plaintiffs

4  like Tele Atlas to rely on a presumption of market power if the tie was created by a valid patent. *See*

5  *id.* Noting that "Congress, the antitrust enforcement agencies, and most economists" had criticized

6  this presumption, *id.* at 45, the Court disavowed its prior jurisprudence and instructed the district

7  court to permit the plaintiffs to produce evidence "defining the relevant market" and "proving that

8  [the defendants] possess power within it." *Id.* at 46.

9    The Ninth Circuit case law interpreting aspects of *Illinois Tool Works* appears difficult to

10  reconcile. *Compare Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir.

11  2008) (holding that "[r]esolution of the market power question on a Rule 12(b)(6) motion is . . .

12  inappropriate" although plaintiff does not appear to have clearly alleged market power) *with*

13  *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971-73 (9th Cir. 2008)

14  (affirming dismissal because "the market power allegations of Rick-Mik's complaint are

15  inadequate"). But this confusion is confined to the motion to dismiss context. The case law is clear

16  that defining a relevant market and the existence of market power are "factual questions." *Rebel Oil*

17  *Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (market definition), *Newcal*

18  *Industries*, 513 F.3d at 1052 (market power); *see also Hynix Semiconductor Inc. v. Rambus Inc.*,

19  2008 WL 73689 (N.D. Cal. Jan. 5, 2008). Therefore, at the summary judgment stage, Tele Atlas

20  must produce evidence sufficient to sustain a jury verdict on these issues. *Rebel Oil*, 51 F.3d at

21  1435, *see generally Hynix Semiconductor*, 2008 WL 73689.

22    To begin, Tele Atlas argues that "establishing market dominance in a tying case 'does not

23  necessitate a demonstration of market power in the sense of section 2 of the Sherman Act.'" Opp'n at

24  37 (quoting *United States v. Loew's*, 371 U.S. 38, 45 n.4 (1962)). Tele Atlas relies on outdated case

25  law. The footnote Tele Atlas quotes from continues by stating that "This is even more obviously

26  true when the tying product is patented or copyrighted, in which case, as appears in greater detail

27  below, sufficiency of economic power is presumed." *Loew's*, 371 U.S. at 45 n.4. This is the

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
   JUDGMENT
   C-05-01673 RMW
   TSF                                                        26

United States District Court
For the Northern District of California

1    reasoning that the Supreme Court specifically disavowed in *Illinois Tool Works*. 547 U.S. at 42. On

2    the contrary, the Court instructed the district court to inquire into whether the plaintiff had properly

3    defined a relevant antitrust market and whether the defendant possessed market power in that

4    relevant market. *See id.* at 46.

5         This inquiry may not be identical to the full-blown inquiry into market power under section 2

6    of the Sherman Act (though this appears to be what the *Illinois Tool Works* Court intended). But it

7    is certainly more rigorous than Tele Atlas' suggestion that it may rely on "any of the traditional

8    means utilized in a tying analysis under Section 1." Opp'n at 38. The *Loew's* opinion suggested that

9    sufficient market power could be found based on a good's "uniqueness or consumer appeal." 371

10   U.S. at 45 n.4. These "traditional means" of establishing a tying claim were clearly rejected by the

11   Supreme Court's instructions requiring proof of a relevant market and proof of market power within

12   that market.

13        **2.    Tele Atlas's Evidence of NAVTEQ's Market Power**

14        Tele Atlas points to four pieces of evidence that it claims establish a triable issue of fact

15   regarding market power in the "Perspective Navigation Technology Market."[15]   Tele Atlas first

16   asserts that a jury could infer that NAVTEQ possessed market power because it sought to obtain the

17   rights to the 3D patents to put them to a "strategic use." Tele Atlas next points to the existence of

18   license agreements tying the 3D patents and map data, and asserts that the "very existence" of such

19   agreements would permit a jury to find that NAVTEQ possessed market power. Third, Tele Atlas

20   claims that the 3D perspective view has no effective substitutes. Finally, Tele Atlas submits that

21   NAVTEQ has a large market share in the perspective navigation technology market, and therefore

22   possesses market power.

23        To begin, Tele Atlas contends that NAVTEQ's subjective intent in procuring the 3D patents

24   is sufficient evidence to support a finding of market power. Tele Atlas argues that if any substitute

25   technologies existed, NAVTEQ could not have rationally believed that acquiring the 3D patents

26   _____

27        [15]    NAVTEQ's motion does not challenge Tele Atlas' definition of the relevant technology
     markets.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                                    27

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  would support NAVTEQ's "strategic goal." According to Tele Atlas, the 3D patents must therefore

2  lack any meaningful substitute and NAVTEQ must possess the power to control price or output in

3  the market for perspective navigation display technology.

4         Tele Atlas cites no case for the proposition that a defendant's belief that an act will confer

5  market power is proof of market power. Looking to the case law under section 2, it is clear that

6  intent alone cannot satisfy a plaintiff's burden of production. *See United States v. Microsoft Corp.*,

7  253 F.3d 34, 59 (D.C. Cir. 2000). In assessing whether or not Microsoft engaged in anticompetitive

8  conduct, the D.C. Circuit stressed that "our focus is upon the effect of that conduct, not upon the

9  intent behind it." *Id.* That is not to say that evidence of NAVTEQ's intent is *entirely* irrelevant.

10  Evidence of NAVTEQ's intent may be helpful to "understand the likely effect" NAVTEQ's decision

11  to obtain the 3D patents and how NAVTEQ's licensing of those patents might benefit it. But any

12  such intent is insufficient to show market power in the absence of additional evidence demonstrating

13  that NAVTEQ possesses market power.

14         Tele Atlas next argues that one can infer that NAVTEQ possesses market power based solely

15  on the existence of tying arrangements. To begin, Tele Atlas's evidence of any such tying

16  arrangements was credible, but not overwhelming. Nonetheless, it is not dispositive of the market

17  power inquiry because the existence of a tying arrangement and the requirement of market power in

18  the tying market are distinct elements of Tele Atlas's claim. To permit the mere existence of a tying

19  arrangement to satisfy the plaintiffs' burden of production on market power is to permit every tying

20  case to proceed to a jury, even where the defendant lacks a shred of market power. This is bad

21  policy, as "[m]any tying arrangements, even those involving patents and requirements ties, are fully

22  consistent with a free, competitive market." *Illinois Tool*, 547 U.S. at 45. The Supreme Court's

23  emphasis on actually proving market power in *Illinois Tool* establishes that Tele Atlas's position is

24  not the law.

25         Tele Atlas's remaining arguments are closely linked and merit being considered together.

26  First, Tele Atlas claims that NAVTEQ has market power because there are no effective substitutes

27  for the technology. Second, Tele Atlas submits that NAVTEQ has a dominant share in the

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                                        28

**United States District Court**
For the Northern District of California

1    technology market.

2          The sum total of the evidence submitted by Tele Atlas to support these arguments follows.

3    Tele Atlas first cites Mr. Ribbink's statement that ███████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████  Ribbink Decl. ¶ 7.  Tele Atlas next submits

6    the personal observation of Mr. Vu, Tele Atlas's Vice President for Personal Navigation Sales, that

7    he ██████████████████████████████████████████████████████████████████

8    ██████████████████████████  Vu Decl. ¶ 3.[16]  Tele Atlas also provides evidence

9    surrounding its attempts to provide a workaround to the 3D patents, which one customer (Cobra) has

10   adopted.  *Baily IV*, Ex. 178 at 620:2-24.  It also appears that NAVTEQ has contacted Cobra to notify

11   Cobra that NAVTEQ believes that the workaround still infringes the 3D patents.  *See id.*, Ex. 179.[17]

12   There is no evidence that NAVTEQ has sued Cobra ██████████████████.

13         This is not much.  *Compare with Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689,

14   *8-*10 (N.D. Cal. Jan. 5, 2008).  Taken as a whole, Tele Atlas's evidence shows that a 3D

15   perspective is an important feature of a personal navigation device, that an alternative for

16   implementing a workaround to NAVTEQ's patents exists, that one company has chosen to use the

17   workaround, and that such a workaround may or may not infringe the 3D patents.

18         It is helpful to consider what is *not* in the record.  Tele Atlas has not submitted any evidence

19

20         [16]    Tele Atlas also submits various market share calculations conducted by Dr. Neels and
21   disclosed in his "rebuttal" report.  The court declined to grant Tele Atlas leave to submit this report and
     does not consider Dr. Neels' report.  Even if it had, it is not certain whether this evidence would have
22   sustained Tele Atlas's burden.  *See Hynix Semiconductor*, 2008 WL 73689, *9 (explaining how a patent
     holder with 100% share of a technology market could often lack market power).

23         [17]    Tele Atlas also states that "although Tele Atlas has considered the option of offering such
24   indemnification [for users of its workaround] to blunt the force of the tie, it has never done so."  Tele
     Atlas argues that this unwillingness to indemnify supports its position that there are no viable substitutes
25   to the 3D patents' technology.  To support this proposition, Tele Atlas cites deposition testimony that
     Tele Atlas has ████████████████████████
26   ███████████████████  *Baily IV*, Ex. 169 at 127:18-20.  It is entirely unclear that the cited
     testimony has anything to do with the 3D patents.  On the other hand, the testimony of George Fink is
27   that ████████████████████████████████████████████████  *See Johnstone Decl.*, Ex.
     H at 53:18-21.

28

1   to suggest that the personal navigation devices on the market infringe the 3D patents.  Without such

2   evidence, it is difficult to discern how NAVTEQ could exclude competition or control quantity.

3   Tele Atlas also proffers no explanation for how NAVTEQ can control price in the technology

4   market.  On the contrary, the NAVTEQ licenses in the record, like the license with Navman, do not

5   expire until the last of the licensed patents expire.  *See* Ramsey Decl., Ex. F § 1.05.  This appears to

6   be NAVTEQ's form license (NAVTEQ's license with Decarta also persists until the final 3D patent

7   expires, *see id.* Ex. G), and Tele Atlas does not introduce any evidence to the contrary.  Hence, once

8   NAVTEQ entered into its form patent license agreement with a device manufacturer, it lost the

9   power to increase price or reduce output over that licensee, and cannot be said to possess market

10  power over it.  *Hynix Semiconductor,* 2008 WL 73689, *9.

11          Tele Atlas has the burden of producing evidence that demonstrates that a jury could

12  reasonably conclude that NAVTEQ possessed the power to manipulate price or output in the

13  perspective navigation display technology market.  The scant offering discussed above fails to

14  satisfy that burden.  Accordingly, the court grants NAVTEQ's motion for summary judgment with

15  respect to Tele Atlas's tying claims because Tele Atlas has failed to produce sufficient evidence that

16  NAVTEQ possesses market power.

17  **III.   TELE ATLAS'S RULE OF REASON CLAIM BASED ON EXCLUSIVE DEALING**

18          NAVTEQ's second motion for summary judgment addresses Tele Atlas's claims that

19  NAVTEQ illegally engages in exclusive dealing.

20  **A.      NAVTEQ's Preferred Supplier Agreements**

21          Beginning in 2001 (long before Tele Atlas attempted to enter the market for North American

22  map data), NAVTEQ began developing its "Preferred-Supplier Program" to create stronger

23  relationships with its data customers.  *See Baily IV*, Ex. 98.  While NAVTEQ believed ████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████        *Id.*  For example, a NAVTEQ employee that had

26  completed a number of pitches remarked that ████████████████████████████

27  ████████████████████████████████████████████████████████████

28

1    █████████████████████ *Id.* The employee based this belief on ███████████

2    ███████████████████████████████████████████████████████████████████████

3    ██████████████████████████████████████████ *Id.* Nonetheless, the employee

4    felt that NAVTEQ's Preferred-Supplier Program ███████████████████████████

5    ███████████████████████████████ *Id.*[18]

6           **1.**     **NAVTEQ's Licensing Relationship with Ford**

7          In 2003, Ford entered into a three-year agreement with NAVTEQ to license NAVTEQ's map

8    data. *Baily IV*, Ex. 8. The agreement provides various sales volume targets and discounts. *Id.* One

9    provision of the agreement was that █████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████████

11   ██████████████ *Id.* This language appears to have created some confusion over the course of the

12   agreement, but as of 2004 NAVTEQ believed that "██████████████████████████

13   ██████████████████████████████████████████████████████████ *Id.*, Ex. 105.

14   ████████████████████████████████████████████████████████ *Id.* In a

15   recent deposition, Dean Von Bank of NAVTEQ further explained that ████████████████

16   ██████████████████████████████████████████████████

17   ███████████████████████████████████████████ *Id.*, Ex. 104 at 56:7-15. The

18   agreement lacks any agreement █████████████████████████. *Id.* at 56:16-23.

19         Over the course of the license, ████████████████████████████

20   ████████████████████████████████████ *Id.* at 65:13-20. ██████████████

21   ███████████████████████████████████████████████████████████████████████

22   ████ *Id.* at 67:11-68:13. This result – ██████████████████████████████████

---

24        [18]    Tele Atlas submits a slideshow titled "NAVTEQ Software Business Overview" from
April 2006. *Baily IV*, Ex. 97. One slide explains that "████████████████████████████████" *Id.* at
NVT-TA 120647. Tele Atlas cites to this document in its discussion of NAVTEQ's map data licensing
contracts for ████████████████. The presentation, which is about NAVTEQ's software business,
not its map data business, is irrelevant. To the extent it is relevant, it hurts Tele Atlas's case because it
suggests that NAVTEQ needed to convert its map data customers into software customers because it
was too easy to switch to Tele Atlas data.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  ██████████ – appears to have resulted from the direct source agreement based on a

2  NAVTEQ employee's reflection in handling a dispute with a third party manufacturer of devices for

3  Ford.  Cliff Fox wrote to numerous other NAVTEQ employees that ████████████

4  ████████████████████████████████████████████

5  ███████████████████████████████████████

6  ████████████ *Id.*, Ex. 106.

### 2.    NAVTEQ's Licensing Relationship with Embedded Device Manufacturers

9  In addition to entering license agreements with car manufacturers like the Ford agreement

10 discussed above, NAVTEQ also entered into licensing relationships with the manufacturers of the

11 navigation devices embedded into new cars or installed in the aftermarket.  Tele Atlas submits two

12 such agreements.

13 NAVTEQ's September 2003 agreement with Johnson Controls requires Johnson ██████

14 █████████████████████████████████████████

15 █████████████ *Baily IV*, Ex. 107 § X-B.  However, the license agreement permitted

16 Johnson ██████████████████████████████████ *Id.*

17 The agreement appears to have a three-year term with the possibility of further extension.  *See id.*

18 The second agreement submitted by Tele Atlas is between NAVTEQ and Harman Becker.

19 NAVTEQ amended its license with Harman Becker effective January 1, 2005.  *Id.*, Ex. 108.  The

20 agreement required Harman Becker to ███████████████████████████

21 ████████████████████ *Id.* § XI-A.  This agreement

22 had a six-year term.  *Id.* § I.

### 3.    NAVTEQ's Relationship with Personal Navigation Device Manufacturers

24 NAVTEQ also added exclusivity provisions to its licensing agreements with personal

25 navigation device manufacturers.  The most significant of these licensing relationships was with

26 Garmin.  The first license between NAVTEQ and Garmin in the record is a territory license effective

27 July 1, 2001.  *See Baily IV*, Ex. 101.  It included a "preferred supplier" provision with a complex set

28 **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT
C-05-01673 RMW
TSF                                          32

**United States District Court**

For the Northern District of California

1  of terms. *See id.* § XII-B. First, the preferred supplier agreement ████████

2  ████████████████████████████████████ *See id.* ████████████

3  ████████████████████████████████████████████████████

4  ████████████████ *Id.* § XII-B-1. Once the agreement took effect, ██████████

5  ████████████████████████████████ *Id.* § XII-B-1-a. ██████████

6  ████████████████████████████████████████████████████

7  ████████████████████. *Id.* ████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████ *Id.*

10      In turn, the agreement outlined ████████████████████████

11  ████████████████████ *Id.* NAVTEQ ████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  *Id.* In the event that ████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████ *Id.* NAVTEQ could ██████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████ *Id.* If NAVTEQ ████████████████████

20  ████████████████████████████████████████████ *Id.* If

21  NAVTEQ ████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████ *Id.*

24      With respect to ████████████████, the preferred supplier provision differed from

25  the one discussed above only in that it took effect July 1, 2002. *See id.* § XII-B-2-a. The license

26  was due to expire June 30, 2005. *Id.* § 1.

27      By January 2004, NAVTEQ ████████████████████████████

28

1 ████████████████████████████████████████████████████████████████

2 ███████████████████████████ *Baily IV*, Ex. 131.[19]  Nonetheless, the parties amended

3 the license agreement effective March 1, 2004 and made some changes to the preferred supplier

4 provision. *Compare Baily IV*, Ex. 109 § XII-B *with id.*, Ex. 101 § XII. The new provision permitted

5 ██████████████████████████████████████[20]██████████████████████████████

6 ████████████████████████████████████████████. *Id.*, Ex. 109 § XII-B.

7 The ████████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████████████

9 ████████████████████████████. *See id.*, Ex. 109 at Ex. F. The ████████████████

10 ████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ███████████████████ *See id.* NAVTEQ and Garmin again extended this license agreement,

13 effective January 1, 2007. *Baily IV*, Ex. 102.

14       NAVTEQ's map data license agreement with Mapopolis (effective April 1, 2004) included a

15 similar exclusivity provision, but Mapopolis was ██████████████████████████████████

16 ████████████████████████████████████████████. *See id.*, Ex.

17 103.

18       Finally, NAVTEQ entered map data licenses with a variety of other personal navigation

19 _____

20       [19]    Tele Atlas also submits a "TA/GDT Merger Study" comprised of findings from an
interview with a NAVTEQ employee to support the proposition that Tele Atlas and NAVTEQ offered
21 similar quality data while NAVTEQ charged substantially more. *Baily IV*, Ex. 132. While the
document comes from NAVTEQ's files, the court cannot find, based on the evidence supplied by Tele
22 Atlas, that the document was more likely than not prepared by a NAVTEQ employee or agent. It
appears more likely that the document was prepared by the Federal Trade Commission or the
23 Department of Justice in evaluating the impact of Tele Atlas's purchase of GDT. Accordingly, the
document does not appear to be exempt from the hearsay rule pursuant to 801(d)(2)(A) and is
24 inadmissible based upon the current record. The court does not strike the exhibit, however, because it
does not impact the court's ruling on the relevant portions of the summary judgment motions.

25       [20]    Mr. Vu states that ████████████████████████████████████████████████

26 ███████████████████████████████████████████████████████████████████████

27 ███████ . Vu Decl. ¶ 5. According to Mr. Vu, ████████████████████████████████

28 █████████████████████████████████████████████████████████. *See id.*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    device manufacturers. *See Baily IV*, Exs. 113-130. These further licenses featured a range of

2    limitations on the manufacturers' ability to use third party data. Some of the licenses featured a ██

3    ██████ preferred supplier provision that ████████████████████████████████████████████

4    ███████████████████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████████. *See, e.g.,*

6    *Baily IV*, Ex. 113 (license with Alpine Electronics, Inc., effective January 1, 2004); Ex. 116 (license

7    with Magellan Navigation, Inc., effective October 1, 2006 and requiring a written explanation of

8    why Magellan rejected NAVTEQ data in any product). A January 1, 2004 license agreement with

9    Thales Navigation, Inc. featured the more strict preferred supplier provision that NAVTEQ used

10    with Mapopolis, *see id.*, Ex. 117, though Thales' 2006 amendment to the agreement ████████████

11    ███████████████████████████████████████████████████████████████████████

12    ███████████████, *id.*, Ex. 118. Netropa entered into a data license with a ██████████████

13    preferred supplier provision in 2006. *Id.*, Ex. 124. Similar provisions appeared in Nextar (Hong

14    Kong) Ltd.'s 2006 license, The Whistler Group's licenses and Teamwarrior Limited's. *Id.*, Exs. 125,

15    127, 129-30.

16       Other licenses lacked any meaningful restriction on third party data use. Navigon's license

17    agreement required █████████████████████████████████████████████████████████

18    ██████████████████████████████████████████████████████. *Id.*, Ex.

19    123. Navigon was also required █████████████████████████████████████████████████

20    ██████████████████████████████████████████████████████████████████████

21    ███████. *Id.* One personal device manufacturer, Lowrance, Inc., simply agreed that ██████████

22    ███████████████████████████████████████████████████████████████. *Id.*,

23    Ex. 120. The Lowrance agreement, effective October 1, 2004, provides no further definition of the

24    term, and it is unclear how the provision could have been enforced. Medion AG's 2006 license

25    agreement lacked a preferred supplier provision. *Id.*, Ex. 122.

26     **B.**     **The Scope of Conduct Reviewed Under the Rule of Reason**

27       Tele Atlas argues that to analyze its section 1 claim pursuant to the rule of reason, the court

28

United States District Court

For the Northern District of California

1    must consider all of NAVTEQ's alleged conduct – the tying of the 3D patents and the purportedly

2    exclusive dealing contracts – as a whole.  Tele Atlas contends that NAVTEQ's separation of the

3    tying allegations from the exclusive dealing allegations "reveals a fundamental misconception of the

4    analysis required under the antitrust laws" and that "there is no basis for NAVTEQ's alternative

5    method of analysis, whereby NAVTEQ considers one course of anticompetitive conduct, determines

6    (incorrectly) that it has not had an effect on competition, wipes the slate clean, and then considers

7    another course of anticompetitive conduct."

8         Tele Atlas's proposed inquiry lacks any legal basis.  Section 1 of the Sherman Act prohibits

9    "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

10   commerce."  15 U.S.C. § 1.  The text of section 1 emphasizes that it is contracts, combinations, and

11   conspiracies that are illegal, and this provides a legal basis for conducting the rule of reason analysis

12   on a contract-by-contract and restraint-by-restraint basis.

13        The Supreme Court's jurisprudence regarding rule of reason and *per se* inquiries makes clear

14   that section 1 prohibits specific restraints, not spectrums of conduct.  "The essential inquiry is

15   'whether or not the challenged restraint enhances competition.'"  VII Areeda & Hovenkamp,

16   Antitrust Law ¶ 1502 (2d ed. 2003) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regenents of*

17   *the Univ. of Oklahoma*, 468 U.S. 85, 105 (1984)).  In turn, a restraint on trade is subject to a "rule of

18   reason" or *per se* inquiry.  "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to

19   which the finder of fact must decide whether the questioned practice imposes an unreasonable

20   restraint on competition, taking into account a variety of factors, including specific information

21   about the relevant business, its condition before and after the restraint was imposed, and the

22   restraint's history, nature, and effect."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1999).  In contrast to

23   the "rule of reason," the Court explained that "*[p]er se* treatment is appropriate '[o]nce experience

24   with a particular kind of restraint enables the Court to predict with confidence that the rule of reason

25   will condemn it.'"  *Id.* (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5 (1958)).

26   Most recently, the Supreme Court explained that "[i]n its design and function the [*per se*] rule

27   distinguishes between restraints with anticompetitive effect that are harmful to the consumer and

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                                                    36

United States District Court
For the Northern District of California

1   restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather*
2   *Products, Inc. v. PSKS, Inc.*, 127 S.Ct. 2705, 2713 (2007). These discussions confirm what is plain
3   from the text of section 1. The rule of reason focuses on a single restraint at a time. Nothing in the
4   Supreme Court's case law suggests that distinct restraints should be considered jointly.

5       Tele Atlas cites a single case to support its argument, *Twin City Sportservice, Inc. v. Charles*
6   *O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982). Tele Atlas argues that the case requires courts
7   to apply the rule of reason to "defendant's aggregate pattern of allegedly illegal behavior." In *Twin*
8   *City*, the defendant argued that the court improperly considered all of its franchise agreements in
9   assessing the effect that its franchise agreements had on the market. 676 F.2d at 1302-03. The
10  defendant argued that on the contrary, the court could only consider the effect on competition of the
11  single contract between the plaintiff and the defendant. *Id.* The Ninth Circuit properly rejected this
12  argument, explaining that "[c]reating such a distinction would require courts to enforce arguably
13  innocuous single contracts that belong to a pattern of contractual relations that significantly restrain
14  trade in a relevant market." *Id.* at 1303. The court instead held that in assessing the effect of an
15  allegedly illegal restraint on competition, the court could consider the full scope of the defendant's
16  use of the restraint. *Id.* at 1303. Tele Atlas notes that in *Twin City* the court considered the
17  "unreasonably long concessions franchise agreements, follow-the-franchise clauses, and predatory
18  cash loans and advances" in finding that the defendant violated section 1. *See id.* at 1302. On its
19  face, this suggests that the court aggregated a range of various types of contracts. The facts
20  supporting the holding in *Twin City* are not clearly laid out in the opinion, but it appears that these
21  harms all flowed from the same "long-term franchise contracts," not from separate types of
22  contracts. *See id.* As these constituted the same "restraint," they were properly considered together.
23  *Cf.* VII Areeda & Hovenkamp, Antitrust Law ¶ 1504d (2d ed. 2003) (defining the scope of a
24  "restraint").

25      Here, Tele Atlas has alleged that NAVTEQ violated the antitrust laws by tying its 3D patents
26  to licensing its map data and by foreclosing competition in the map data market with its preferred

27
28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
    JUDGMENT
    C-05-01673 RMW
    TSF                                    37

**United States District Court**
For the Northern District of California

1  supplier contracts.[21]  These are two separate alleged restraints of trade, and they are properly

2  analyzed separately.[22]

3       **C.     The Exclusivity of the Preferred Supplier Provisions**

4       NAVTEQ argues that the court must grant summary judgment on Tele Atlas's claims based

5  on the alleged exclusive dealing because NAVTEQ's license agreements permit its licensees to

6  obtain digital map data from other sources if NAVTEQ's data were not comparable.

7       The Supreme Court has emphasized that whether a contract creates an exclusive dealing

8  arrangement depends on the contract's "practical effect" and its "practical application." *Tampa Elec.*

9  *Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Indeed, the three cases cited by NAVTEQ

10  illustrate this practical inquiry.  In *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th

11  Cir. 1997), the allegedly exclusive dealing contracts existed between a manufacturer of gas station

12  equipment and its distributors.  127 F.3d at 1160-61.  The Ninth Circuit affirmed a summary

13  judgment in favor of the manufacturer because "the short duration and easy terminability of these

14  agreements negate substantially their potential to foreclose competition."  *Id.* at 1163.  Specifically,

15  Gilbarco's form domestic distributor agreement provided for a one-year term, after which either

16  party could terminate the agreement.  *Id.* at 1163 n.6.  After the initial one-year term, either party

17  could terminate the exclusive distribution agreement on 60 days notice.  *Id.*  To be clear, the court

18  did not hold that the contracts were not exclusive, and hence, the case is not clearly on point for

19  NAVTEQ's argument.  The court instead held that the contracts lacked the "potential to foreclose

20  competition" because a competing manufacturer could easily lure away Gilbarco's distributors.  *Id.*

21  at 1163-64.

22

23       [21]     Tele Atlas also submits evidence that NAVTEQ ████████████████
24  by entering into contracts with Circuit City and Best Buy.  As a factual matter, these attempts appear
     to have failed in that NAVTEQ's promotional deal with Best Buy appears to have lasted only six months
25  and NAVTEQ's deal with Circuit City never materialized.  Nonetheless, Tele Atlas fails to explain how
     this conduct violated section 1.

26       [22]     Because Tele Atlas has failed to produce evidence that NAVTEQ possessed market
27  power in the tying technology markets, its rule of reason claims under section 1 based on the alleged
     tying also fail. *Illinois Tool Works*, 547 U.S. 28, 42-43.

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                                                38

**United States District Court**
For the Northern District of California

1   The second case cited by NAVTEQ actually held that certain contracts were not exclusive

2   dealing arrangements, and therefore granted summary judgment to the defendant. *Western Parcel*

3   *Exp. v. United Parcel Service of Am., Inc.*, 65 F. Supp. 2d 1052 (N.D. Cal. 1998) (Legge, J.), *aff'd*

4   190 F.3d 974 (9th Cir. 1999). But this case too illustrates the practical examination of the contracts'

5   terms. The record in *Western Parcel* showed that "[a]ll of the contracts in evidence have termination

6   clauses that allow either party to terminate for any reason as long as 7, 10, or 30 days notice,

7   (depending on the specific contract) is given." 65 F. Supp. 2d at 1064. "Nearly all of the contracts

8   have relatively short durations, ranging from 30 days to 3 years." *Id.* The court also emphasized

9   that:

10          Most important, none of the contracts contain terms requiring a customer to give all
            of its shipping business to UPS. The contracts often require the customer to maintain
11          certain levels of volume in order to receive agreed pricing discounts. And some of
            the contracts state that the customer will make UPS the preferred carrier for the
12          customer's regional shipping needs. But that is not a requirement that the customer
            can use only UPS.
13

*Id.* at 1065.

14          Unlike the contracts in *Omega Environmental* and *Western Parcel*, NAVTEQ's map data

15   licenses with Garmin, Mapopolis and Ford (the focus of NAVTEQ's motion) do not appear so

16   innocuous. The licenses with Garmin and Mapopolis contain such lengthy procedures for permitting

17   them to use third-party data that one can readily infer that in the rapidly evolving market for

18   personal navigation devices, neither company could wait to exercise the "quality out" in their

19   licenses. The license with Ford and its affiliates does not appear exclusive on its face, but the

20   evidence provided by Tele Atlas suggests that the NAVTEQ believed the contract was exclusive and

21   that Ford treated it that way. None of these contracts contained an easy method for terminating the

22   agreement, and all of the contracts were for multiple years. Examining the "practical effect" of these

23   contracts as required by *Tampa Electric*, Tele Atlas has demonstrated that a jury could conclude that

24   these three contracts create exclusive dealing arrangements.

25   **D.       The Extent of Market Foreclosure**

26          A defendant's exclusive dealing arrangements must have the "probable effect" of

27

28

United States District Court

For the Northern District of California

1   "foreclos[ing] competition in a *substantial* share of the line of commerce affected" to violate the

2   antitrust laws. *Omega Environmental*, 127 F.3d at 1162 (emphasis added). NAVTEQ argues that

3   Tele Atlas cannot establish that NAVTEQ's agreements with Ford, Mapopolis and Garmin

4   "substantially foreclosed" competition in the market for North American digital map data because

5   the three agreements comprise too small a share of the market.

6          Here, the inquiry requires the court to gauge the share of the market foreclosed by the

7   exclusive dealing contracts. *Id.* Levels of foreclosure between 20% and 40% may represent a

8   "substantial share" of the market. *Id.* However, as demonstrated by the analysis in *Omega*

9   *Environmental*, the market share calculation is only a first step. *Id.* There, the court considered a

10  foreclosure of 38% potentially significant, but minimized because the exclusive dealing contracts

11  existed between a manufacturer and a distributor, not between a manufacturer and a consumer. *See*

12  *id.* at 1162-63. Notably, this is not the case here. The final consumers of digital map data are the

13  manufacturers of devices that use such data. Thus, one of the factors that mitigated the potential

14  anticompetitive harm of the agreements in *Omega Environmental* is not present here. The *Omega*

15  *Environmental* court also stressed the ease with which the distributors could exit the exclusive

16  contracts, suggesting that the market was not truly foreclosed because the distributors the plaintiff

17  wished to recruit could have easily terminated their exclusive deals with Gilbarco. *Id.* at 1163. As

18  discussed above, this is not the case with NAVTEQ's map data licenses.

19         *Omega Environmental*'s examination of factors that might lessen the harm suggested by a

20  foreclosure percentage alone compel the court to also examine factors that *aggravate* the harm

21  imposed by certain exclusive dealing arrangements. Tele Atlas raises a number of issues that

22  militate against entering summary judgment. Unlike the package shipping business or gas station

23  equipment distribution business considered in the Ninth Circuit's recent cases, this case is about

24  digital map data. The record reflects that the market for North American map data is essentially a

25  duopoly shared by NAVTEQ and Tele Atlas. Indeed, NAVTEQ's documents reflect that it worried

26  that its preferred supplier program would not succeed because map data purchasers prefer to

27  maintain relationships with both companies to keep them competing against each other and to use

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
    JUDGMENT
    C-05-01673 RMW
    TSF                                              40

United States District Court
For the Northern District of California

1    one to control the other's prices.  This is also a market with incredibly high barriers to entry.

2    Compiling a database like those developed by NAVTEQ and Tele Atlas takes years of time and

3    immense sums of money.  A digital map maker must invest enormous sunk costs before licensing a

4    single copy.  On the other hand, once a database exists, licensing another copy has virtually no

5    marginal cost.  Finally, the evidence suggests that once a manufacturer integrates a map database

6    into its product, it is expensive to switch that product to another map database.  Unlike the

7    distribution market in *Omega Environmental* that is "less cause for anticompetitive concern," 127

8    F.3d at 1162, a concentrated product market with high sunk costs, zero marginal costs, and high

9    switching costs for consumers is one meriting heightened scrutiny because of the ease with which a

10   prospective monopolist can seize market share, discourage entry and recoup its profits.

11        With this in mind, Tele Atlas has demonstrated that a triable issue of fact exists regarding

12   whether NAVTEQ's contracts substantially foreclosed competition.  The parties dispute the proper

13   market definition, and in the market for map data used by personal navigation device makers

14   proposed by Tele Atlas, NAVTEQ's contract with Garmin alone comprised over 35% of that market

15   for map data.  Such a degree of foreclosure, combined with the indicia that this is a marketplace

16   warranting heightened scrutiny, prevents granting summary judgment on this point.

17        **E.    Causation**

18        The antitrust laws require proof that the plaintiff has been injured by the defendant's

19   anticompetitive conduct.  *See, e.g.*, 15 U.S.C. § 15(a).  This requires the plaintiff to present evidence

20   that the defendant's anticompetitive conduct was a "material" or "substantial" cause of its injury.

21   *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 fn.9 (1969); *see Greater Rockford*

22   *Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401-04 (7th Cir. 1993) (explaining antitrust

23   injury case law).  But "a plaintiff need not exhaust all possible alternative sources of injury in

24   fulfilling his burden of proving compensable injury" and "inquiry beyond this minimum point goes

25   only to the amount and not the fact of damage." *Zentith Radio*, 395 U.S. at 114 fn.9.  NAVTEQ also

26   moves for summary judgment on the basis that Tele Atlas cannot prove that its injuries stem from

27   NAVTEQ's conduct, as opposed to Tele Atlas's own failures to supply quality map data.

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
     JUDGMENT
     C-05-01673 RMW
     TSF                                                      41

United States District Court
For the Northern District of California

1    NAVTEQ's internal communications belie this argument.  During an internal discussion

2   regarding how to resolve an issue regarding ████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████ *Baily IV*, Ex. 106.  The

6   email is from early 2004, and indeed suggests that █████████████████████████████

7   ████████████████████████████████████ Regardless whether other factors

8   might account for some of the damage to Tele Atlas (or reduce Tele Atlas's monetary injury), this

9   email would permit a jury to find that NAVTEQ's agreement with Ford was a material cause of Tele

10   Atlas's injury.

11    Another NAVTEQ email addresses the situation with respect to Garmin.  Again, in early

12   2004, one NAVTEQ employee wrote to another requesting ideas for how to prove that NAVTEQ

13   data was superior to Tele Atlas's because █████████████████████████████████████

14   ████████████████████████████████████████████████ *Baily IV*, Ex. 152.

15   Earlier that year, NAVTEQ's director of North American sales mused that █████████████

16   ████████████████████████████████████████████████████████████████████████

17   ████████ *Id.*, Ex. 131.  To be sure, NAVTEQ has presented evidence that Tele Atlas's failure in

18   Garmin's quality testing – not NAVTEQ's exclusive dealing contract – caused Garmin not to license

19   data from Tele Atlas.  This, however, requires a credibility judgment that is not appropriate at this

20   stage.

21    Finally, evidence of the market context of device manufacturers from NAVTEQ's initial

22   attempts to pitch its preferred supplier program suggest that NAVTEQ's contracts were a material

23   cause of Tele Atlas's injury.  NAVTEQ's employees doubted ███████████████████

24   ████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████ because of the manufacturers' "policy of 2nd

26   sourcing products."  *Baily IV*, Ex. 96.  To the extent that a device manufacturer had such a policy, it

27   is possible that Tele Atlas would have been that second source (even if NAVTEQ won the bulk of

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                          42

United States District Court
For the Northern District of California

1   the business) because of the manufacturers' desire to keep ███████████████

2   ████████████████████████████ *Id.* Against this commercial background, it is

3   conceivable that NAVTEQ's exclusive dealing arrangements deprived Tele Atlas of business and

4   were thus a material cause of Tele Atlas's injury.

5           Accordingly, the court cannot grant NAVTEQ summary judgment on Tele Atlas's rule of

6   reason claims based on NAVTEQ's exclusive dealing arrangements.

7                        **IV.   TELE ATLAS'S SECTION TWO CLAIM**

8           Tele Atlas next argues that NAVTEQ has violated section 2 of the Sherman Act by

9   monopolizing or attempting to monopolize various markets. NAVTEQ's motion for summary

10  judgment does not clearly address this claim, though it does argue that if Tele Atlas cannot establish

11  a claim based on exclusive dealing, Tele Atlas cannot establish a section 2 claim. As discussed

12  above, NAVTEQ is not entitled to summary judgment with respect to Tele Atlas's claims based on

13  NAVTEQ's purported exclusive dealing. Accordingly, Tele Atlas's section 2 claim also survives.[23]

14          The parties' briefing raises an ancillary issue about the *scope* of the conduct that might

15  support Tele Atlas's section 2 claim. Tele Atlas argues that it may rely on its allegations of tying to

16  help establish its section 2 claim, even if they cannot separately support a section 1 claim. Tele

17  Atlas cites a line of cases beginning with *Continental Ore Co. v. Union Carbide & Carbon Corp.*,

18  370 U.S. 690 (1962), which suggests that the court should not "approach [the] claims as if they [are]

19  completely separate and unrelated lawsuits." 370 U.S. at 698-99. Instead, the court should consider

20  the defendant's various acts and examine them collectively for any "synergistic result." *California*

21  *Computer Products, Inc. v. International Business Machines, Corp.*, 613 F.2d 727, 746 (9th Cir.

22  1979). NAVTEQ cites various cases that hint otherwise, but in fact, the cases cited merely suggest

23  that where the various allegedly anticompetitive acts are not anticompetitive and produce no

24  anticompetitive "synergy," summary judgment is proper. *E.g.*, *id.* Accordingly, while Tele Atlas

25  has failed to produce evidence sufficient to support its claims that NAVTEQ's patent licensing

26  _____

27          [23]     Analogously, Tele Atlas's claim under California Business & Professions Code § 17200
    survives.

28  **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
    JUDGMENT
    C-05-01673 RMW
    TSF                                                    43

1  violated section 1 of the Sherman Act, its tying allegations are similar to its exclusive dealing

2  allegations in that both courses of conduct were purportedly intended to thwart Tele Atlas's entry

3  into the market for North American map data.  This suggests there may be some "synergy" between

4  the two courses of conduct making them appropriate for the jury to consider in concert.

5                         **V.  INTENTIONAL INTERFERENCE TORTS**

6          Tele Atlas also alleges that NAVTEQ intentionally interfered with its contractual

7  relationships and with its prospective economic advantages.  NAVTEQ moves for summary

8  judgment on both.

9          A basic element of a claim for intentional interference with contract is "actual breach or

10  disruption of the contractual relationship."  *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50

11  Cal.3d 1118, 1126 (1990).  With this standard in mind, NAVTEQ submits the following testimony

12  from the deposition of Tele Atlas's CEO:

13          Mr. Koropp:   Are you aware of any existing contractual relationships of Tele
                          Atlas's that have been disrupted because of anything you consider to
14                        be wrongful or improper that was doe by NAVTEQ?
            Mr. de Taeye: Contractual agreements, you said?
15          Mr. Koropp:   Yes.
            Mr. de Taeye: No.

16

17  *Gervase III*, Ex. B at 42:42:20-43:7 (objections omitted).

18          Tele Atlas responds by arguing that "Tele Atlas need not show that its CEO knew about

19  NAVTEQ's conduct or about its effects in order to prove its intentional interference claims."  This is

20  correct, but Tele Atlas must respond with some evidence showing that NAVTEQ interfered with a

21  contractual relationship.  Tele Atlas must submit some evidence from which the fact finder could

22  conclude that NAVTEQ's conduct actually disrupted Tele Atlas's contractual relationships.  Tele

23  Atlas fails to do so.  The only evidence it submits comes from the declarations of Alexander Ribbink

24  and Quan Vu, in which they both declare that ███████████████████████████████████

25  ████████████  Ribbink Decl. ¶ 16, Vu Decl. ¶ 4.  Neither testify to the existence of a contractual

26  agreement between TomTom and Tele Atlas on this point, and it appears that none existed.  Because

27  there is no evidence of a contractual agreement (or interference with one), Tele Atlas's first

28

**United States District Court**
For the Northern District of California

1    intentional interference claim fails.

2         The tort of intentional interference with prospective economic advantage also requires proof

3    of interference and proof that the "interference was wrongful 'by some measure beyond the fact of

4    the interference itself.'"   *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393

5    (1995).  To be "wrongful," the defendant's conduct "must be wrongful by some legal measure, rather

6    than merely a product of an improper, but lawful, purpose or motive."  *Korea Supply Co. v.*

7    *Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159 n. 11.  The only conduct Tele Atlas relies on to

8    establish this claim is NAVTEQ's purported tying of the 3D patents to its map data licenses.

9    Whatever NAVTEQ's motive may have been for this course of conduct is irrelevant under *Korea*

10   *Supply.*  What is relevant is the legality of the conduct, and the court has rejected Tele Atlas's claim

11   that NAVTEQ's patent licensing practices violate the antitrust laws.  Because Tele Atlas points to no

12   other evidence of any other intentional wrongful conduct by NAVTEQ, the court grants NAVTEQ's

13   motion for summary judgment on this claim.

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28

**PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY
JUDGMENT
C-05-01673 RMW
TSF                                    45

United States District Court
For the Northern District of California

**VI.  ORDER**

For the foregoing reasons, the court denies Tele Atlas leave to submit an additional expert report.  The court grants in part and denies in part the motions to strike evidentiary material as described above.  The court grants NAVTEQ's motions for summary judgment with respect to Tele Atlas's tying claims (federal and state law) and with respect to Tele Atlas's intentional interference tort claims.  The court denies NAVTEQ's motions for summary judgment in all other respects, preserving Tele Atlas's claims based on exclusive dealing and monopolization, as well as the analogous state law claims.

An unredacted copy of this order will be publicly filed within seven (7) days of the date of this order, absent a meritorious request by a party that certain portions of the order be redacted from the publicly filed copy.

DATED:   10/20/2008

_Ronald M Whyte_
RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California

PUBLIC REDACTED ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT
C-05-01673 RMW
TSF

**United States District Court**
For the Northern District of California

1   **Notice of this document has been electronically sent to:**

2   **Counsel for Tele Atlas:**

3   Melissa J Baily             melissabaily@quinnemanuel.com
     David Eiseman              davideiseman@quinnemanuel.com
4   Robert P. Feldman          rfeldman@wsgr.com
     Kristin Janet Madigan      kristinmadigan@quinnemanuel.com
5   William Morehead          williammorehead@quinnemanuel.com
     Emily Christina O'Brien     emilyobrien@quinnemanuel.com

6

7   **Counsel for NAVTEQ:**

8   David S. Bloch             dbloch@winston.com
     Andrew Bridges           abridges@winston.com
9   David Koropp             dkoropp@winston.com
     George Lombardi         glombardi@winston.com
10   Kevin Joon Oh            koh@winston.com
     Megan Elizabeth Schaefer   mschaefer@winston.com
     Dan Webb               dwebb@winston.com

11

12   Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program in each action.

13

14   Dated: _____10/28/2008_____       _____TSF_____
                                          **Chambers of Judge Whyte**

15

16

17

18

19

20

21

22

23

24

25

26

27

28   **PUBLIC REDACTED** ORDER GRANTING IN PART AND DENYING IN PART NAVTEQ'S MOTIONS FOR SUMMARY JUDGMENT
     C-05-01673 RMW
     TSF                                 47